# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Disability Rights Ohio, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:18-cv-894 |
| | : | |
| v. | : | Judge Edmund A. Sargus |
| | : | Magistrate Judge Chelsey M. Vascura |
| The Buckeye Ranch, Inc. | : | |
| | : | |
| Defendant. | : | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiff Disability Rights Ohio seeks to enjoin Defendant Buckeye Ranch, Inc. from restricting its statutorily-mandated authority to speak confidentially with youth who reside at its facility. Plaintiff requests that this Court issue a preliminary injunction, requiring Buckeye Ranch to permit Plaintiff to have reasonable unaccompanied access to youth at the facility, to the full extent permitted by state and federal law.

Plaintiff's Memorandum in Support of this Motion is attached.

Respectfully submitted,

**NEWHOUSE, PROPHATER, KOLMAN
 & HOGAN, LLC**

 */s/ D. Wesley Newhouse*
D. Wesley Newhouse        (0022069)
  wnewhouse@npkhlaw.com
Michel Jendretzky        (0082224)
  mjendretzky@npkhlaw.com
5025 Arlington Centre Blvd., Suite 400
Columbus, Ohio 43220
Telephone: (614) 255-5441
Facsimile: (614) 255-5446

Co-Counsel for Plaintiff

**DISABILITY RIGHTS OHIO**

/s/ Laura Osseck
Laura Osseck            (0082231)
losseck@disabilityrightsohio.org
Kerstin Sjoberg         (0076405)
Ksjoberg@disabilityrightsohio.org
200 Civic Center Drive, Suite 300
Columbus, Ohio 43215
Telephone: (614) 466-7264
Facsimile:  (614) 644-1888

Co-Counsel for Plaintiff

## MEMORANDUM IN SUPPORT

Plaintiff Disability Rights Ohio ("DRO") seeks a preliminary injunction because Defendant BR ("BR") is violating federal and state laws by prohibiting DRO from speaking confidentially with the youth who are detained at BR. DRO requests that this Court enter a preliminary injunction to allow it to fulfill its mandate as the protection and advocacy system for people with disabilities in Ohio.

### I. BACKGROUND AND FACTS

#### A. Defendant denied DRO access to youth residing at its facility.

BR operates a residential treatment facility (i.e. class one facility) for children with mental illness. Its residential treatment facility is licensed by the Ohio Department of Mental Health. Approximately 100 children with mental illness can be served by Defendant's licensed residential facilities. Further, BR is a certified mental health agency. Many of the youth who are institutionalized at BR are in the custody of a children services board. Individuals with mental illness, developmental disabilities, and/or other physical or mental impairments that substantially

limit one or more major life activities of such individuals are institutionalized at Defendant Buckeye Ranch.

On July 12, 2018, DRO advocate Katherine Yoder, whose declaration is attached hereto as Exhibit 1, reviewed an incident report provided to DRO by the Ohio Department of Mental Health. She requested from BR and received videotape footage of the incident. Among other things, the videotape showed an employee of BR lifting a child by his injured arm, and then yanking and twisting the injured arm. The videotape ends with the child holding his arm and sobbing while three staff stand nearby. The incident report did not contain a full summary of what was revealed on the videotape. Ms. Yoder asked BR to provide videotape from before and after the incident to provide context for the incident, and BR refused.

Ms. Yoder then reviewed incident reports for four more incidents involving three additional youth, and videotapes supplied by BR for three of the incidents. The incidents occurred on July 30 and August 3. ODMH supplied the incident reports, and BR provided the videotapes. As set forth in some detail in Ms. Yoder's declaration, the videotapes revealed significant potential abuse in the form of physical restraint of and contact with the youth. A portion of one of the incidents happened off camera. The videotapes showed that other youth witnessed the incidents. Ms. Yoder requested additional videotape from before and after the incidents, and access to other youth in the facility who may have witnessed or otherwise known of the incidents. BR refused these requests.

Although BR agreed to make two of the youth who were the subjects of the suspected abuse available for interviews at the facility on August 16, BR withdrew its permission to enter its premises as Ms. Yoder was in transit to the facility.[1] See declaration of Laura Osseck, attached as Exhibit 2.

---

[1] On August 22, counsel for stated that BR would make the two youth available on August 24.

Although BR alleges that county and state agencies have investigated the incidents and found that allegations of abuse were not substantiated, it has not provided to the Court or DRO any documentation corroborating this.

Although it asserts that DRO must obtain consent from the parents or guardians of any youth it may seek to interview, a position which is unsupported by the law, BR has not provided the names and contact information for the parents or the guardians.[2]

**B. Congress created the protection and advocacy system as a safeguard for people with disabilities.**

In response to national reports uncovering serious abuse and neglect of people with disabilities in segregated facilities, Congress created the Protection and Advocacy ("P & A") system, a national network of independent agencies that serve as a safeguard for people with disabilities. *See generally*, 42 U.S.C. § 15041 *et seq.* (developmental disabilities), 42 U.S.C. § 10801 *et seq.* (mental illness), 29 U.S.C. § 794e (other physical or mental impairments), collectively, the "P & A statutes." Congress enacted these statutes "after concluding that state systems for protecting the rights of individuals with disabilities varied widely and were in many cases inadequate." *Disability Rights Wisconsin, Inc. v. State of Wisconsin Dep't of Pub. Instruction*, 463 F.3d 719, 722 (7th Cir. 2006); *see also Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312, 1317-21 (S.D. Ala. 2014).

As a condition of receiving federal funding for people with disabilities, the P & A statutes require each state to establish an effective protection and advocacy agency to protect the rights of individuals with disabilities and respond to allegations of abuse and neglect. *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 247, 131 S. Ct. 1632, 1633-34, 179 L. Ed. 2d 675 (2011); *Disability Rights Wisconsin*, 463 F.3d at 722–23. There is a P & A agency in "every state

---

[2] On August 22, counsel for BR offered to provide the list on Friday, August 24.

and U.S. territory, as well as one serving the Native American population in the four corners region." *See* National Disability Rights Network, NDRN Member Agencies, available at http://www.ndrn.org/en/ndrn-member-agencies.html (last visited on October 6, 2016). DRO is designated by the Governor of the State of Ohio as the protection and advocacy system for people with disabilities in Ohio. *See* Ohio Rev. Code §§ 5123.60 and 5123.601[3]; *Exec. Orders 2012-14K* and *2015-10K*, attached as "Exs. 1 and 2."

To carry out their responsibilities, "including the authority to 'pursue legal, administrative, and other appropriate remedies' on behalf of individuals with disabilities," P & A agencies have broad authority to access individuals, records, and facilities that provide care or treatment to individuals with disabilities, and authority to conduct investigations of suspected abuse or neglect of individuals with disabilities. 42 U.S.C. §10805(A)(1)(a).

Investigation is a critical component of P & A access authority because it directly protects the most vulnerable from abuse, and assists in identifying those practices of a facility that pose the greatest danger to residents. DRO monitors and investigates residential treatment facilities for youth because, in its experience, youth with disabilities in these facilities are particularly vulnerable to abuse, neglect, and rights violations, yet they have fewer natural supports in place because they have limited contact with their families and support systems. Many youths are unaware of their rights, and very few are familiar with DRO's role as the P & A Agency. During investigation visits, DRO observes physical conditions, gathers information from staff, and then speaks privately with residents so they have an opportunity to confidentially discuss concerns about their experiences at the facility.

---

[3] As of October 12, 2016, sections of Ohio Rev. Code Chapters 5123 and 5126 will be amended to replace the outdated term "the mentally retarded" with the term "individuals with developmental disabilities."

DRO has no law enforcement authority. It cannot charge the institutions it investigates with crimes. It is required to make its own assessment of whether there is probable cause to seek access to records and individuals, but its determination of probable cause will not result in criminal of civil enforcement proceedings by the state. When a facility like BR denies DRO access, such as was the case here, DRO's recourse is to seek an order from a court allowing it to receive records and to interview victims and witnesses. DRO and the other P&A's do not have independent authority to impose penalties or to otherwise compel compliance with state or federal laws.

## II.  ARGUMENT

DRO seeks a preliminary injunction because BR's continuing violation of federal and state law prevents DRO from fulfilling its mandate as the protection and advocacy system for people with disabilities in Ohio. A preliminary injunction is appropriate in this case because DRO's legal authority to speak confidentially with youth at BR is clear under federal and state law, and the factors for issuing a preliminary injunction favor DRO.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)) *State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 653 (D. Conn. 2005); *Ohio Legal Rights Serv. v. BR, Inc.*, 365 F. Supp. 2d 877, 883 (S.D.Ohio 2005);[4] *Wisconsin Coal. for Advocacy, Inc. v. Czaplewski*, 131 F. Supp. 2d 1039, 1051 (E.D.Wis. 2001);

---

[4] Ohio Legal Rights Service was the independent state agency precursor to DRO. On October 1, 2012, Ohio Legal Rights Service ceased to exist and DRO succeeded it as the P & A agency.

6

*Prot. & Advocacy For Persons With Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 311 (D.Conn. 2003)).

### A. DRO is likely to succeed on the merits of its claims.

#### 1. DRO is likely to succeed on the merits of its claims pursuant to federal law.

DRO has asserted claims pursuant to three federal P & A statutes and the Ohio Revised Code. The law surrounding P & A access authority is well-settled, and DRO is likely to succeed on the merits of its claims. A party need only demonstrate a likelihood of success on the merits on the "central issue" of a party's claims in order to satisfy this prong. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.1997).

Under the P&A Acts, DRO is authorized to investigate suspected incidents of abuse and neglect of individuals with disabilities, 42 U.S.C. § 15043(a)(2)(B), as well as to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for . . . such individuals." 42 U.S.C. § 15043(a)(2)(A)(i). In enacting the original PAIMI Act, Congress recognized that P&As would need broad access to fulfill their mandate. Congress expressed its intent to grant P&As the fullest and broadest possible access: "The Committee recognizes the need for full access to facilities and clients and to their records in order to ensure the protection of mentally ill persons. It is the intent of the Committee that the [P&A system] have the *fullest possible access* to client records . . . ." S. Rep. 109, 99th Cong., Sess. 10 (1985) (emphasis added), *reprinted in* 1986 U.S.C.C.A.N. 1361, 1370.

Congress mandates this broad P&A access authority for two main purposes: (1) access for the purpose of investigating allegations of abuse and/or neglect, 42 U.S.C. 10802(2), 42 U.S.C. § 10805(a)(3), 45 C.F.R. § 1386.22(f), 42 C.F.R. § 52.42(b), and (2) access for the purpose of monitoring the facility and the treatment of its residents. 42 U.S.C. § 15043(a)(2)(H), 42 U.S.C. §

10805(a)(3), 45 C.F.R. § 1386.22(g), 42 C.F.R. § 51.42(c). DRO asserts its rights to access the requested information to investigate allegations of abuse and neglect.

Congress has found that "individuals with mental illness are vulnerable to abuse and serious injury" as well as "neglect, including lack of treatment . . . ." 42 U.S.C. § 10801(a)(1) and (3). Moreover, Congress found that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801(a)(4). Accordingly, Congress has granted P&As, such as DRO, with the power to "investigate incidents of abuse and neglect of persons with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 10805(a)(1)(A).

PAIMI's implementing regulations reflect the intention for broad access as they clearly contemplate unaccompanied access to minors for purposes of investigating incidents of abuse and neglect. And, in such circumstances, consent from the parents and guardians is not required. "The P&A system shall have reasonable unaccompanied access to residents at all times necessary to conduct a full investigation of an incident of abuse or neglect. This authority shall include the opportunity to interview any facility service recipient, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation." 42 C.F.R. § 51.42(b). DRO's access authority includes private interviews with minors, and DRO is not required to obtain parent/guardian consent prior to its interviews. *See* 42 C.F.R. §§ 51.42(c), (d), and (e); 45 C.F.R §§ 1326.27(c)(1) and (d); *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. Of Educ.*, 464 F.3d 229, 242-43 ("Nothing in the statutory language of either the DD Act or PAIMI conditions this access on the consent of an individual's parents or guardians."). Private interviews are a critical component of monitoring facilities for potential abuse or neglect. *Equip for Equal.,* 292 F. Supp.

8

2d at 1101 ("Private meetings with patients are important to the success of the P & A system because it gives patients the opportunity to be candid about their experiences at the facility.").

Similarly, for individuals with developmental disabilities, 42 U.S.C. § 15043(a)(2)(H) grants DRO "access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided." For individuals with other physical or mental impairments that substantially limit a major life activity, 29 U.S.C. § 794e(f)(2) extends to DRO "the same general authorities" as in 42 U.S.C. § 1504. Courts have taken a broad view of P&A access authority in regards to public and private schools by consistently holding that they must permit the P&A to operate effectively and with broad discretion and independence in accessing individuals, facilities, and records for investigative purposes. *See Disability Rights Wis. Inc. v. Wis. Dep't of Pub. Instruction*, 463 F.3d 719, 728-30 (7th Cir. 2006) (authorizing P&A access to records related to a state agency investigation into use of seclusion rooms for disciplining students at an elementary school); *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. Of Educ.*, 464 F.3d 229, 240-45 (2nd Cir. 2006) (finding that a P&A system was authorized to obtain the names of all students in a therapeutic educational program for students who require special education and the name and contact information for parents and legal guardians of the students).

Here, DRO has probable cause to believe that incidents of abuse and neglect have occurred and are still occurring at BR. DRO was provided with incident reports and videotape recordings showing the probable improper use of restraints and other abuse. Although BR alleges that there have been investigations of the incidents by state and county agencies, and that they have found that the allegations of abuse are not substantiated, BR has provided to neither DRO nor the court any evidence that such investigations occurred, and that they led to findings that the allegations were not substantiated. In any event, DRO is independently authorized by federal law to

investigate, and is not bound by the alleged findings of state and county agencies.

BR's assertion that the information Plaintiff requests is confidential and not subject to release is unfounded and unsupported by law. Not only do the P&A Acts permit the release of the requested information, P&A's are required to maintain the confidentiality of such information once obtained through its access authority: "[T]hese records shall remain confidential[,] and [] the eligible system shall maintain confidentiality in compliance with applicable State, Federal, and local laws . . . ." S. REP. 99-109, *reprinted in* 1986 U.S.C.C.A.N. 1361, 1370 (July 25, 1985). *See* 42 U.S.C. § 10806(a) and 45 C.F.R. § 1386.22(e)(1). In a similar cause of action to the case at bar, the Second Circuit Court of Appeals in *State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, requested the U.S. Department of Education (DOE) and the U.S. Department of Health and Human Services (HHS) to file an amicus brief regarding the issue of disclosure of student names and parental contact information to the P&A. 464 F.3d 229. In their brief, DOE and HHS took the position that educational institutions should "interpret the investigatory authority of a P&A pursuant to the PAIMI Act as extending to *any facility* providing care and treatment to the mentally ill" and interpret the PADD Act to "expressly contemplate that a school or other facility will provide contact information to a P&A in order to allow the P&A to carry out its responsibility to investigate abuse or neglect." United States Br. for Amici Curiae the Dep't of Educ. and the Dep't of Health & Human Servs. at 10.

The Court in the Connecticut P&A case considered the issue of potential conflict between the confidentiality requirements of FERPA and IDEA and the DD and PAIMI Acts and noted that "given the unequivocal statutory mandate afforded to protection and advocacy systems to access records in specific situations and the statutory responsibility of such organizations to keep such records confidential, FERPA and IDEA did not prevent educational institutions and agencies from

providing such systems with records." *State of Conn. Office of Prot. & Advocacy for Persons with Disabilities*, 355 F. Supp. 2d at 663 (D. Conn. 2005); *see also Michigan Prot. & Advocacy Serv. v. Miller*, 849 F. Supp. 1202, 1208 (W.D. Mich. 1994).

In those cases, the agencies under investigation could point to specific requirements of federal statutes in making their argument for non-disclosure on confidentiality grounds. Here, BR expresses a nebulous and generalized concern for protecting the privacy of the youth in its care, ignoring that DRO is likewise mandated by law to maintain the confidentiality of the records and details of its interviews. *Equip for Equal.,* 292 F. Supp. 2d at 1096 (due to stringent confidentiality requirements, "a P & A system never should be prohibited from accessing a facility because of concerns about patient privacy"). The argument by BR is meritless, and verges on specious.

The PAIR Act also provides for services to individuals with disabilities that are neither developmentally disabled under the PADD Act nor mentally ill under the PAIMI Act. 29 U.S.C. § 794e(a)(1)(B). For example, an individual with a learning disability or orthopedic impairment would be eligible for services under the PAIR Act. P&As providing services under the PAIR Act enjoy the same general access authority as those set forth in the PADD Act, and may likewise "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protections of, and advocacy for, the rights for such individuals [with disabilities]." 29 U.S.C. § 794e(f)(1)-(3). Accordingly, the confidentiality requirements of the PADD Act also apply to the PAIR Act.

The Act not only describes the range of services to be provided by the protection and advocacy systems, it also states that the systems *must have the authority* to perform those services. The state cannot satisfy the requirements of the [DD and PAIMI Acts] by establishing a protection and advocacy system which has the authority in theory, but then taking action which prevents the

system from exercising that authority. *Miss. Prot. & Advocacy Sys., Inc. v. Cotten*, 929 F.2d 1054, 1059 (5th Cir. 1991) (emphasis in original). Any other reading of the Acts "would attribute to Congress an intent to pass an ineffective law." *Ala. Disabilities Advocacy Program v. Tarwater Developmental Ctr.*, 894 F. Supp. 424, 429 (M.D. Ala. 1995), *aff'd*, 97 F.3d 492 (11th Cir. 1996).

BR is a "facility" that falls under the scope of DRO's access authority. It is also a "location in which services, supports, and other assistance are provided" to individuals with disabilities. *See* 42 U.S.C. § 15043(a)(2)(H). BR wrongfully denied DRO access to the requested information. Consequently, there is a substantial likelihood that DRO will prevail on its claim.

### 2. DRO is likely to succeed on claims brought pursuant to the Ohio Revised Code

In addition to DRO's access authority under the federal P & A statutes, DRO also has clear authority under Ohio law to speak to the youth institutionalized at BR. Ohio Rev. Code § 5123.601(A)(4) grants DRO access "[a]t any time" to "all persons detained, hospitalized, or institutionalized" and "persons receiving services under [Chapter 5123] or Chapter 340., 5119., 5122., or 5126. of the Revised Code."

Youth at BR are "institutionalized," under Ohio Admin. Code § 5122-30-03 (42)(a) (definition of class one facility for individuals with mental illness) and Ohio Rev. Code § 5123.01(J) (definition of institution for individuals with developmental disabilities). BR falls within this definition because it is equipped to provide residential care and treatment for youth with mental illness and developmental disabilities. Furthermore, youth detained at BR have a variety of conditions and needs, and many likely receive services in the community for developmental disabilities (Ohio Rev. Code Chapters 5123 and 5126), and mental illness or substance abuse (Ohio Rev. Code Chapters 340 and 5119).

12

### B. DRO will suffer irreparable harm if it is unable to speak confidentially with youth at the BR.

DRO meets this prong of the preliminary injunction test because courts have concluded that a P & A agency's inability to meet its federal statutory mandate to protect and advocate for the rights of individuals with disabilities is an irreparable harm for purposes of injunctive relief. *Ohio Legal Rights*, 365 F. Supp. 2d at 883 ("There is no dispute that a protection and advocacy agency's inability to meet its federal statutory mandate to protect and advocate the rights of disabled people constitutes irreparable harm."); *Connecticut Office* 464 F.3d at 234 (2d Cir. 2006).

BR's refusal to allow DRO to speak confidentially with institutionalized youth threatens DRO's ability to discharge its statutorily-mandated obligations. *See Wisconsin Coal*, 131 F. Supp. 2d at 1051 (holding that denial of access to records "does, in a very real and readily identifiable way, pose a threat to the plaintiff's being able to discharge its obligations" and "no amount of damages will remedy that sustained harm"). This threat is particularly irreparable for the youth who will cycle in and out of BR during the time that DRO is denied access because those youth will not be aware of DRO's services or have an opportunity to request DRO's assistance.

Without a preliminary injunction, DRO will continue to be unable to fulfill its mandate to protect and advocate for the rights of youth with disabilities who are detained at BR. This harm cannot be addressed through monetary damages at a later date, so injunctive relief is necessary.

### C. The balance of equities tips in DRO's favor.

The balance of equities tips in the favor of DRO because BR will not suffer substantial harm if this Court issues a preliminary injunction, while DRO's access authority and ability to carry out its federally mandated duties will be severely compromised absent injunctive relief from this Court. The Sixth Circuit has described this third prong as "whether issuance of a preliminary injunction would cause substantial harm to others." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th

Cir. 2000) (citation omitted). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008) (quotation marks and citation omitted).

Issuance of an injunction against BR does not subject the Defendants to a penalty or hardship because it requires them to do exactly what the P & A statutes require: allow DRO access to institutionalized youth. *See Advocacy Ctr. v. Stalder,* 128 F. Supp. 2d 358, 368 (M.D. La. 1999). On the other hand, Defendants' refusal to allow DRO to access youth at BR for investigatory purposes does, in a very real and readily identifiable way, pose a threat to DRO's ability to discharge its statutorily mandated obligations. *See Wisconsin Coal*, 131 F. Supp. 2d at 1051.

Nor would an injunction harm any third parties, especially the youth institutionalized at BR. DRO routinely conducts investigative visits of facilities in Ohio without adverse effects to DRO's constituents, who benefit from the education, resources, and services that DRO provides. DRO respects the privacy of the youth with whom it meets, and has offered repeated assurances that it will conduct its activities in a time and manner that is not disruptive to the youth.

  **D.**  **The public interest will be served by this Court granting a preliminary injunction.**

The public interest is served by the fulfillment of DRO's mandate as the protection and advocacy agency, as evidenced by Congress's findings regarding the need for the P & A system. In determining the public interests that are relevant to a motion for a preliminary injunction, this Court may consider Congress's statements about the public interest. *See* 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.4 (2d ed.1995) ("The public interest may be declared in the form of a statute."); *see also*, *NACCO Materials Handling Group, Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x. 929, 944 (6th Cir. 2007), *citing*

*id*.  By passing the P & A statutes, Congress made an explicit finding that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801.  Congress created the P & A system, funded it, and granted it broad access authority because individuals with disabilities are "vulnerable to abuse, injury, and neglect." *Pennsylvania Prot. & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 425 (3d Cir. 2000).  By passing the P & A statutes, Congress has expressed that the public interest is satisfied by allowing P & A agencies like DRO access to individuals at BR.

Other courts have agreed that the public interest is served by granting P & A systems injunctive relief under similar circumstances.  *See, e.g.*, *Michigan Prot.*, 2010 WL 3906259, at *5 ("It is in the public's interest to have agencies such as Plaintiff able to access the necessary records to ensure individuals with disabilities are not suffering from abuse or neglect.") (issuing permanent injunction and awarding attorney's fees); *Advocacy Inc. v. Tarrant Cty. Hosp. Dist.*, No. 4:01-CV-062-BE, 2001 WL 1297688, at *6 (N.D. Tex. Oct. 11, 2001) ("Nor is the public interest done a disservice by the timely investigation and resolution of concerns about the treatment of the more vulnerable members of society.").  Thus, congressional findings and purpose, as well as federal courts' interpretation of the P & A statutes, demonstrate that the issuance of a preliminary injunction in this matter is in the public interest.

### III.   DRO SHOULD NOT BE REQUIRED TO POST A BOND

The Sixth Circuit has interpreted Fed. R. Civ. P. 65(c) to provide the district judge discretion to determine whether a bond is required for security.  *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir.1995) (affirming district court's decision to waive bond based on strong legal merit and public interest component).  The equitable circumstances of the present case support a conclusion that the posting of a bond is not warranted.  *See Am. Sys. Consulting, Inc. v. Devier*, 514 F. Supp. 2d 1001, 1010 (S.D. Ohio 2007) (finding that a bond was not warranted

after an equitable analysis). DRO's underlying case is strong, as evidenced by extensive precedent supporting P & A access authority. DRO is a non-profit organization attempting to enforce its federally-mandated access authority, which Congress created to ensure that the rights of individuals with disabilities would be enforced and protected. There is a strong public interest component in this case.

DRO respectfully asks that the bond requirement be waived.

## IV. CONCLUSION

For these reasons, DRO respectfully requests that this Court issue a preliminary injunction against Defendants, requiring Defendant BR and Defendant Dana C. Moore to permit Plaintiff DRO to have reasonable unaccompanied access to youth detained at BR, to the full extent permitted by state and federal law.

Respectfully submitted,

**NEWHOUSE, PROPHATER, KOLMAN & HOGAN, LLC**

*/s/ D. Wesley Newhouse*

D. Wesley Newhouse (0022069)
  wnewhouse@npkhlaw.com
Michel Jendretzky (0082224)
  mjendretzky@npkhlaw.com
5025 Arlington Centre Blvd., Suite 400
Columbus, Ohio 43220
Telephone: (614) 255-5441
Facsimile: (614) 255-5446

Co-Counsel for Plaintiff

**DISABILITY RIGHTS OHIO**

*/s/ Laura Osseck*

Laura Osseck (0082231)
  losseck@disabilityrightsohio.org
Kerstin Sjoberg (0076405)
  Ksjoberg@disabilityrightsohio.org
200 Civic Center Drive, Suite 300
Columbus, Ohio 43215
Telephone: (614) 466-7264
Facsimile: (614) 644-1888

Co-Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

   I hereby certify that on August 23, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will also send such notification to:

Laura Osseck
Kerstin Sjoberg
Disability Rights Ohio
200 Civic Center Drive, Suite 300
Columbus, Ohio 43215

   I also hereby certify that I have sent same by e-mail only on this same date to:

Maribeth Meluch
Isaac, Wiles, Burkholder & Teetor, LLC
Two Miranova Place, Suite 700
Columbus, OH 43215
mmeluch@isaacwiles.com

             */s/ D. Wesley Newhouse*
             D. Wesley Newhouse  (0022069)
             Michel Jendretzky   (0082224)