UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **DISABILITY RIGHTS OHIO,** | : | Case No. 2:18-cv-894 |
| | : | |
| Plaintiff, | : | Related case: 2:18-cv-906 |
| | : | |
| v. | : | Judge Sargus |
| | : | Magistrate Judge Vascura |
| **THE BUCKEYE RANCH, INC.,** | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**BRIEF OF AMICUS CURIAE ACADIA HEALTHCARE IN SUPPORT OF DEFENDANT THE BUCKEYE RANCH, INC.**

**I.     INTRODUCTION**

Buckeye Ranch laudably abided by its duty under Ohio law to self-report potential incidents of abuse of patients in its mental health facility. County agencies charged with the duty of investigating of these reports under state law found no evidence of abuse or neglect. Nonetheless, Disability Rights Ohio ("DRO"), a Protection and Advocacy System ("P&A") created by the State of Ohio under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, seeks to conduct its own investigation into Buckeye Ranch's activities. At the heart of the cases before this Court is whether DRO has the authority to obtain the broad access to patients and records that it seeks when the incidents that have triggered DRO's interest have already been investigated, with no evidence of abuse found.

Amicus Curiae Acadia Healthcare Company, Inc. ("Acadia Healthcare") respectfully urges this Court to rule in favor of Buckeye Ranch. The broad access that DRO is seeking in this case is an unwarranted intrusion into the operations and caregiving that Buckeye Ranch provides.

While Amicus Curiae acknowledges that P&A's have a vital role to protect mental health patients under the PAIMI Act, that role must be exercised in a reasonable manner, with due regard given to the purposes of the PAIMI Act and the mission of the facilities that treat individuals suffering from mental health issues.

**II.     STATEMENT OF INTEREST**

Amicus Curiae Acadia Healthcare was established in January 2005 to develop and operate a network of behavioral health facilities across the country. Acadia Healthcare pursues excellence in the treatment of specialty behavioral health and addiction disorders and strives to create behavioral health centers where people receive care that enables them to regain hope in a supportive, caring environment.

Acadia Healthcare provides behavioral health and addiction services to patients in a variety of settings, including inpatient psychiatric hospitals, specialty treatment facilities, residential treatment centers, and outpatient clinics. Headquartered in Franklin, Tennessee, Acadia Healthcare operates a network of more than 500 behavioral healthcare facilities in 40 states (including in Ohio), the United Kingdom, and Puerto Rico.

Of particular relevance to the instant case is the Ohio Hospital for Psychiatry ("OHP"), a facility operated by Acadia Healthcare in Columbus, Ohio. OHP is a 130-bed, free-standing behavioral health hospital, which offers care to adults and senior citizens who grapple with significant mental and behaviorial health conditions, including bipolar disorder, depression, anxiety, self-harm, aggression, and substance abuse. OHP's team of mental health professionals creates and implements individualized treatment plans to fit the unique needs of each individual under OHP's care. Through individualized and comprehensive treatment programs, OHP attempts to provide healing solutions for patients and their families.

Like Buckeye Ranch, OHP provides high quality care for patients who struggle with emotional, behavioral, and mental health issues.. Also like Buckeye Ranch, OHP is a facility that is subject to scrutiny by DRO.

### III. ARGUMENT

The PAIMI Act authorizes P&A systems such as DRO to "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 10805(a)(1)(A). It further provides that a P & A system "shall . . . have access to facilities in the State providing care or treatment." *Id.* § 10805(a)(3). Under the PAIMI Act, the term "facilities" includes hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons. *Id*. § 10802(3). Buckeye Ranch and Amicus Curiae's facility, OHP, are "facilities" within the meaning of the PAIMI Act.

Chapter I of Title 42 of the Code of Federal Regulations, adopted by the United States Department of Health and Human Services ("DHHS"), also governs the authority of P&A systems. In order to investigate incidents of abuse or neglect when a P&A system either receives a complaint or has probable cause to believe that such incidents have occurred, the regulations grant authority to the P&A to have "reasonable unaccompanied access residents at all times necessary to conduct a full investigation of an incident of abuse or neglect." 42 C.F.R. § 51.42(b). This "reasonable unaccompanied access" shall be at reasonable times and be conducted in such a manner "so as to minimize interference with facility programs, respect residents' privacy interests, and honor a resident's request to terminate an interview." 42 C.F.R. § 51.42(c).

3

It is not disputed that DRO is a P&A system within the meaning of the PAIMI Act or that the statutory scheme set forth in the PAIMI Act grants broad investigatory powers to DRO to carry out its statutory duties. What is disputed, however, is how broadly those investigatory powers reach. While Amicus Curiae is mindful and respectful of DRO's role and the laudable efforts DRO makes to fulfill that role, it must not be forgotten that the treatment facilities like Buckeye Ranch and OHP have an equally important mission—the welfare and protection of individuals who are mentally ill, developmentally disabled, or struggling with addiction. The concern of Amicus Curiae is that P&A's are given too much power and too much discretion in conducting their investigatory powers, to the point of disruption of the mission of care providers like Buckeye Ranch and OPH.

A. **Probable Cause is Necessary.**

In DRO's Second Supplemental Memorandum in Support of Motion for Preliminary Injunction (ECF No. 15), DRO claims to have the broad investigatory power granted to P&A's in the PAIMI Act. In arguing for its authority to investigate the matters that Buckeye Ranch self-reported to state and county agencies, DRO argues—

> It is undisputed that Plaintiff DRO received reports of incidents of abuse and neglect. Defendant BR seems to assert that, because it sent its own incident reports to the Ohio Department of Mental Health, and that agency then forwarded them to Plaintiff DRO, DRO did not "receive" the reports as contemplated by the statute. The statute, however, does not confine the obligation and right of P&A's to conduct investigations based on the source of the report of abuse or neglect. No common sense reading of the language of the statute can lead to the insertion of such a restriction.

(DRO Supp. Memo., ECF No. 15, at 9-10.)  DRO then goes on to take the position that the receipt of the ODH reports triggered DRO's obligation to investigate, "regardless of the existence of probable cause."

4

In 42 U.S.C. § 10801(b), Congress explained the purpose behind the PAIMI Act. In particular, § 10801(b) states that the purpose of the PAIMI Act is to "assist States to establish and operate a protection and advocacy system for individuals with mental illness which will . . . investigate incidents of abuse and neglect of individuals with mental illness if the incidents are *reported to the system* or if there is probable cause to believe that the incidents occurred." (Emphasis added.) *See also* 42 U.S.C. § 10805(a)(1)(A) (P&A shall have authority to "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred"). Under the PAIMI Act, then, a P&A's power to investigate is triggered by one of two things—a report "to the [P&A] system" or the existence of probable cause. *Id.*

The key inquiry then, is whether the self-reporting by Buckeye Ranch under R.C. 2151.421, which DRO apparently learned about from the Ohio Department of Mental Health and Addiction Services ("ODMHAS") (Second Supp. Memo. of DRO, ECF No. 15, at p. 9), qualifies as a "report to the system" (*i.e.*, to DRO), such that probable cause is not required for DRO to investigate the self-reported incidents at Buckeye Ranch. A P&A "is authorized to investigate incidents of abuse and neglect if the incidents are reported to it, even if [the P&A] as no other information upon which to base probable cause." *Iowa Prot. & Advocacy Servs. v. Tanager Place,* No. 04-0069, 2004 U.S. Dist. LEXIS 20009 (N.D. Iowa Sept. 30, 2004).

Though 42 U.S.C. § 10805(a)(1)(A) grants to P&A systems the authority to investigate incidents of abuse and neglect that "are reported to the system," the statute does not otherwise define what "report" means. *See generally* 42 U.S.C. § 10802. In regulations implementing the PAIMI Act, the term "complaint" and "report" appear to be treated synonymously. "Complaint" is defined as "any report or communication, whether formal or informal, written or oral, received

5

by the P&A system, including media accounts, newspaper articles, telephone calls (including anonymous calls) from any source alleging abuse or neglect of an individual with mental illness." 42 C.F.R. § 51.2. In elaborating upon this definition, DHHS treated it as synonymous with the term "report," and explained--

> The Act states that a P&A system has the authority to investigate incidents of abuse and neglect that are either reported to the system or where there is probable cause to believe that the incidents have taken place. The Department believes that media accounts and newspaper articles can be viewed as the equivalent of a complaint when they provide details about a specific incident of abuse or neglect. While such reports are not specifically directed at the P&A system, *they are published with the expectation that public officials responsible for conditions will act to stop abuse*. P&A systems have that role. This does not preclude a P&A system from acting on behalf of an unnamed client or on behalf of a class of people.

62 Fed. Reg. 53548, 53551 (Oct. 15, 1997) (emphasis added).

While the regulation contemplates a broad definition of what qualifies as a "complaint" or "report" that may trigger action by a P&A, the italicized language above signals an important qualifier. The report must have been made with the expectation that public officials (presumably including P&A's themselves) will "act to stop the abuse." While this expectation is most likely the case whenever an individual reports an incident directly to a P&A, the same cannot be said for mandated self-reports that mental health facilities are required to make under R.C. 2151.421, such as the reports Buckeye Ranch made in the case before this Court.

Buckeye Ranch reported incidents to the appropriate agencies under R.C. 2151.421, to err on the side of reporting incidents that could potentially qualify as "abuse" or "neglect" within the meaning of state law. These incidents were not reported directly to DRO, but, rather, were received by DRO because the ODMHAS forwarded them to DRO. (ECF No. 15, at p. 9.) It is unclear, at best, why the ODMHAS forwarded these self-reports to DRO. But nowhere does DRO claim that ODMHAS made DRO aware of Buckeye Ranch's self-reports in order to

6

involve DRO in an investigation into the reported incidents. It is reasonable to infer that the ODMHAS did not do so in order to have DRO take action to investigate; indeed, if that were the case, DRO would surely have alleged that fact in its communications with Buckeye Ranch, in the pleadings, or in the myriad filings that have been made in this case.

Whatever the reason ODMHAS sent the self reports to DRO, the reports should not be viewed as a report to DRO that triggers the investigatory powers under the PAIMI Act. There is no indication that these reports were anything other than Buckeye Ranch abiding by its statutory to report possible incidents and to have the appropriate Ohio state and/or local agencies investigate them as provided in Ohio law. The reports were made with the expectation that the state and/or local agencies responsible for investigating them would do so, pursuant to the policies and procedures set forth under state law. (And indeed, pursuant to Ohio law, the local county agencies who had legal custody over the children involved in the reports investigated the incidents and found no abuse.) There is no indication that the Buckeye Ranch self-reported for any reason other than this statutory state-law purpose. Without more, such self-reports should not equate with a report to DRO within the meaning of the PAIMI Act.

**B.     Probable Cause Should Not Be Deemed to Exist When State Authorities Have Investigated Self-Reported Incidents and Found No Abuse or Neglect.**

The relevant regulation promulgated under the PAIMI Act defines probable cause to mean: "reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect." 42 C.F.R. § 51.2. While DRO relies on the reports it received from ODMHAS (which were, in turn, received from Buckeye Ranch as a result of the self-reporting requirements of Ohio law) as the basis of probable cause, these self-reports should not be viewed as the determinant of probable cause. Where, as here, (1) the mental health facility has abided by its statutory duty to self report suspected incidents of abuse

7

or neglect under R.C. 2151.421 and (2) the public agency charged with investigating the report has found no abuse or neglect, probable cause is lacking for purposes of the P&A's ability to exercise its investigatory powers under the PAIMI Act.

In its second supplemental memorandum in support of its motion for preliminary injunction, DRO relies on a multitude of cases for the proposition that a P&A is the "final arbiter" of the existence of probable cause and that it "may not be second-guessed by the facilities and organizations that it investigates." (ECF No. 15, at p. 11.) To be sure, a legion of federal cases recites that a P&A System is the "final arbiter" of probable cause for purposes of triggering the P&A's authority to access all records. *Ohio Legal Rights Serv. v. Buckeye Ranch, Inc.*, 365 F.Supp.2d 877, 887 (S.D.Ohio 2005) (collecting cases). While this line of cases positing the P&A as the "final arbiter" of probable cause may seem to insulate DRO's probable cause determination from scrutiny, the PAIMI Act is not as sweepingly deferential to the P&A's judgment of "probable cause" as DRO states.

Amicus Curiae respectfully submits that DRO's "probable cause" determination is not insulated from judicial review. As Buckeye Ranch has noted in this case, "[t]he fundamental dispute here is the differing interpretation each party has as to what events trigger the authority of a P&A System, such as DRO here, to obtain records and interview children under the PAIMI." (ECF No. 10, at 2.) Despite the multitude of federal cases reciting that the P&A System is the "final arbiter" of probable cause, the regulations implementing the PAIMI Act suggest that a P&A System's determination is not necessarily the final word on the issue.

The Department of Health and Human Services ("DHHS") is the agency charged with the implementation of the PAIMI Act. When DHHS promulgated regulations governing the PAIMI

8

Act, it sought to define what "probable cause" means for purposes of triggering the P&A's access to facilities and individuals.  When implementing the final rule, DHHS noted—

> In addition, a large number of commenters supported the proposal that probable cause be defined as a belief based solely on the independent judgment of the system (advocate, attorney, or other person authorized to act on behalf of the system). Commenters argued further that it be made clear that the system is not required to disclose the basis of its probable cause finding to a facility or to any other third party; their determination should not be subject to review by a facility, authority, or Court or some other third party. The Department agrees that the determination of whether sufficient probable cause exists shall be based on the independent judgment of the P&A system (that is, the judgment of the advocate, attorney, or other person authorized to act on behalf of the P&A system); however, it is outside of the Department's purview to give sole discretion to the P&A system in this matter. ***The Department does not have the authority, by regulation, to insulate a P&A system from having to articulate the basis of its probable cause determination when requested.***

62 Fed. Reg. 53548, 53552 (Oct. 15, 1997) (emphasis added).  Thus, when DHHS was asked to promulgate a regulation that gave P&A's virtually unbridled authority to determine when probable cause existed to access individuals and records (from facilities like Buckeye Ranch) under the PAIMI Act, it did not do so, citing a lack of statutory authority to do so. So by DHHS's own interpretation of the PAIMI Act it is charged with implementing, the P&A system's probable-cause determination is *not* insulated from review.

The scenario in this case calls for scrutiny of DRO's probable cause determination.  This is not a case in which a report of abuse or neglect was made directly to DRO.  Rather, this is a case in which DRO learned of self-reports of possible abuse and neglect from ODMHAS, which in turn received the self-reports from Buckeye Ranch.  But the self-reports by Buckeye Ranch did not lead to a determination that there had, in fact, been abuse or neglect of patients.  To the contrary, the county agencies charged with investigating Buckeye Ranch's reports under R.C. 2151.421 conducted their investigations and found no evidence of abuse or neglect.

9

Amicus Curiae respectfully submits that this state of events does not create probable cause for a P&A to investigate a mental healthy facility under the PAIMI Act. To allow a P&A to claim probable cause based upon state-mandated self-reports that have already been investigated by the county agencies responsible for investigating them under state law would be tantamount to allowing a P&A to search for general operational misconduct. The P&A would be perpetuating a probe into a facility's conduct under the guise of investigating an incident where abuse and/or neglect have already been found *not* to have occurred.

Under the PAIMI Act, probable cause must be supported by facts pointing to the abuse of a specific individual of individuals. *Disability Law Ctr. v. Discovery Academy*, No. 2:07-cv-755 CW, 2010 U.S. Dist. LEXIS 410, at *11 (D. Utah Jan. 5, 2010). The PAIMI Act "does not vest [a P&A] with authority to conduct broad based investigations of 'general operational misconduct.'" *Id.* Thus, in *Discovery Academy*, the district court found probable cause lacking in a situation where the P&A continued to seek access to students and records of a therapeutic boarding school even after the lone student for whom it had received a report of possible abuse no longer attended the school. *Id.* at *11-19. Even though the P&A in *Discovery Academy* was concerned that the incident involving the former student was not isolated, the district court did not allow the broad investigation sought in that case. In doing so, the district court rejected the P&A's argument that the P&A alone was the final arbiter of probable cause in all cases:

> This is not a case where the [P&A] has come forward with factual support for a probable cause finding and the defendant is arguing that the facts are insufficient. This is not a case in which the defendant [facility] is asserting that it is the final arbiter of whether there is probable cause. Rather, in this case the defendant [facility] is asserting that the court is the arbiter of whether the [P&A] has a factual basis for its unsupported assertion that probable cause exists.
>
> To accept the [P&A's] s argument would require the court to interpret the law as allowing an advocacy center to determine, without any checks or balances of its demand, when it may conduct what is effectively a search and seizure of the

> [the facility's] records and information. To find that the PAIMI would authorize such unlimited discretion in the Center would raise the constitutional concerns addressed in *Donovan* [*v. Dewey*, 452 U.S. 594, 601 (1981)]. In that case the Court upheld the constitutionality of warrantless regulatory searches, in part, because the act at issue did not allow forcible entries and the subject of the search had recourse to the federal district court should the requested search exceed constitutional limits.

*Id.* at *16-17.

Like the P&A in *Discovery Academy*, DRO contends that it is the sole and final arbiter of the existence of probable cause. (ECF No. 15, at p. 11.) Like the P&A in *Discovery Academy*, DRO is asking this Court to endorse the view that a service provider must allow the P&A to conduct its investigation, no matter how broad, once the P&A has decided probable cause exists. But to accept this argument "would require the court to interpret the law as allowing [a P&A] to determine, without checks or balances of its demand, when it may conduct what is effectively a search and seizure of [a facility's] records and information," not to mention the intrusion upon the facility's patients and the facility's treatment of its patients. As the *Discovery Academy* court observed, to find that the PAIMI Act authorizes such unlimited discretion would raise constitutional concerns.

DRO's interpretation of the PAIMI Act asks the Court to endorse an unwarranted intrusion into the operations of caregivers like Buckeye Ranch (and treatment of individuals under their care). Just as the P&A in *Discovery Academy*, DRO is demanding broad access to anyone it requests to interview, as well as unfettered access to any records it asks for. Of particular concern is DRO's demand for surveillance footage that is not connected with the purported incidents of alleged abuse that DRO cites as its basis for its investigation. DRO is making these demands based upon Buckeye Ranch's self-reporting of incidents that have been

11

(1) already investigated by state agencies charged with investigating them and (2) found not to have been incidents of abuse or neglect.

The self report required by R.C. 2151.421 should not form the basis of a probable cause finding when it has been investigated pursuant to state law and where no finding or abuse or neglect is found.  When the state and local agencies responsible for investigating these reports have found no abuse or neglect, the P&A has no reasonable cause to believe that any abuse or neglect has taken place.  For DRO to continue to intrude into the operations of Buckeye Ranch under these circumstances is little more than the search for operational misconduct, which is not permitted under the PAIMI Act.

**C.     The PAIMI Act Allows Only Reasonable Access.**

The PAIMI Act allows reasonable access to P&A's carrying out their statutory duties.  Amicus Curiae respectfully submits that the reasonableness determination must be made in the context of the circumstances under which the P&A is seeking access to a facility and its records.

In this case, DRO is bootstrapping the statutorily-mandated self-reports that Buckeye Ranch made under state law into a full-blown investigation into the policies and practices of Buckeye Ranch.  DRO is seeking access not only to records of the incidents in question, but also additional records (*viz.*, video surveillance recordings) that, according to Buckeye Ranch, do not relate to the incidents that were reported to state and local officials.  DRO's broad requests for access and information *might* be justified *if* there were a substantiated incident of abuse or neglect reported to DRO or if there were a patient in imminent damager.  But that is not the case here.  Indeed, even DRO has not acted with the sense of urgency that would be indicative of a suspicion of serious abuse or neglect taking place at Buckeye Ranch.

In order to justify the disruption into a facility's operations and care of patients, there must be something more than simply the self reports mandated under state law. If DRO's arguments are given credence, any self-report by a facility would result in the double whammy of being investigated by not only the state agencies in charge of investigating such reports, but also by P&A systems. The disruption into the facility's care of patients should occur only when necessary, not simply because the P&A wants to search for possible operational misconduct.

Moreover, the "unaccompanied access" demanded by DRO in this case begs the question of what is reasonable. According to DRO, Buckeye Ranch has taken the position that when a county children's services agency has demanded that one of its representatives be present at an interview, Buckeye Ranch does not allow the interview to take place unless the desired representative is present. (ECF No. 15, at 5.) Relying on 42 C.F.R. § 51.42(b)'s "reasonable unaccompanied access" language, DRO insists that it have the opportunity to interview the children without a children's services agency representative present.

DRO's interpretation of 42 C.F.R. § 51.42(b) is not a reasonable one. In context, the term "unaccompanied access," with reference to residents of a facility, is reasonably construed to mean unaccompanied by representatives *of the facility* whose conduct is being investigated by the DRO. There is no indication in the regulatory language (or the statutory language for that matter) to support a broad right for the P&A to interview a resident without the resident's parent or guardian present. In this case, it appears that the county children's services agencies have custody of the children sought to be interviewed by DRO and are therefore in the role of the children's guardians. DRO presents no explanation of why it should be allowed to interview children without the children's legal guardian present when that guardian expresses a desire to be there. In insisting upon an overly board interpretation of "unaccompanied access," DRO is

13

trampling upon the role of the children's services agencies in this instance, who are abiding by *their* statutory duties of care vis-à-vis the children over whom they have legal custody. *See* R.C. 5153.16.

Moreover, when interpreting the meaning of "unaccompanied access" under 42 C.F.R. § 51.42, it must not be forgotten that the regulation allows only *reasonable* unaccompanied access. When interpreting what is "reasonable," this Court should be mindful of the Congressional findings and purpose that accompanied the enactment of the PAIMI Act in the first place. In particular, Congress found that "mentally ill individuals are vulnerable to abuse and serious injury" and that a purpose of the PAIMI Act was to "ensure that the rights of mentally ill individuals are protected." 42 U.S.C. §§ 10801(a)(1) and (b)(1).

The mentally ill, particularly mentally ill children, are among the most vulnerable persons in our society. The county children services agencies who wish to be present when a P&A desires access to children under their legal custody are seeking to protect the rights of those children. When a county children's services agency or other legal guardian of a mentally ill individual wishes to be present when a P&A seeks access, that request should be deemed reasonable. Under such circumstances, unaccompanied access is unreasonable unless the P&A can demonstrate some need to have access without the guardian present.

## IV. CONCLUSION

For these reasons, Amicus Curiae supports the position of Buckeye Ranch in these consolidated cases and urges the court to deny the injunctive relief sought by DRO in this case.

Respectfully submitted,

*s/Vladimir P. Belo*
Vladimir P. Belo (0071334)
Thomas W. Hess (0025149)
Dinsmore & Shohl LLP
191 W. Nationwide Blvd., Suite 300
Columbus, OH 43215
Phone: (614) 628-6880
Fax: (614) 628-6890
thomas.hess@dinsmore.com
vladimir.belo@dinsmore.com

Attorneys for Amicus Curiae

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed with the Court electronically through the CM/ECF system on September 28, 2018, thereby effectuating service upon all interested parties through their counsel of record.

*s/ Vladimir P. Belo*
Vladimir P. Belo
