# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DISABILITY RIGHTS OHIO,

           **Plaintiff,**

   **v.**

BUCKEYE RANCH, INC.,

           **Defendant.**

**Case No. 2:18-CV-894**
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

---

BUCKEYE RANCH, INC.,

           **Plaintiff,**

   **v.**

DISABILITY RIGHTS OHIO,

           **Defendant.**

**Case No. 2:18-CV-906**
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This matter is before the Court on the motion filed by Disability Rights Ohio ("DRO"), in which it "requests that this Court issue a preliminary injunction, requiring Buckeye Ranch to permit [DRO] to have reasonable unaccompanied access to youth at the facility," and to be provided certain records in the possession of Buckeye Ranch (Case No. 18-cv-894, ECF No. 7),[1] and Buckeye Ranch's Motion for a Temporary Restraining Order ("TRO") in which it requests that the Court "prohibit [DRO] from unauthorized access to certain of its records and the youth

---

[1] Unless otherwise noted, all docket references are made to the docket in case number 2:18-cv-894.

who reside at the Buckeye Ranch" (Case No. 18-cv-906, ECF No. 2). For the reasons set forth below, and in accordance with this decision, the Court **GRANTS** DRO's Motion for Preliminary Injunction and **DENIES** Buckeye Ranch's Motion for Temporary Restraining Order.

## I.

The Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801–10851 (2000), the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD"), 42 U.S.C. §§ 15001–15115 (2000), and the Protection and Advocacy of Individual Rights Act ("PAIR"), 29 U.S.C. § 794e (2000) (collectively, the "P & A Acts") authorize a protection and advocacy system ("P & A system") to "monitor the care of and advocate on behalf of individuals with mental illness and developmental or other disabilities." *Connecticut Off. of Protec. and Advoc. For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 233 (2d Cir. 2006) ("*Connecticut Office of P & A*") (citing 29 U.S.C. § 794e(a)(1); 42 U.S.C. §§ 10801, 15001). "To further these objectives, the P & A system 'has extensive authority to access individuals, patient records, and public and private facilities.'" *Matter of Disability Rights Idaho Req. for Ada County Coroner Records Relating to the Death of D.T.* ("*Disability Rights Idaho*"), 168 F. Supp. 3d 1282, 1286 (D. Idaho 2016) (quoting 42 U.S.C. 10805(a)); citing *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 497 (11th Cir. 1996) ("*Tarwater*") ("It is clear that [PAIMI] provides express authority for P & As to gain broad access to records, facilities, and residents to ensure that [PAIMI's] mandates can be effectively pursued.")).

The P & A Acts "offer States federal money" and require "[a]s a condition of funding, a State must establish a [P & A] system 'to protect and advocate the [rights of individuals with mental illness and developmental or other disabilities].'" *Virginia Off. For Protec. and Advoc. v.*

*Stewart*, 563 U.S. 247, 247 (2011) (citing 42 U.S.C. § 15043(a)(1)). "A participating State may appoint either a state agency or a private nonprofit entity as its P & A system, but if a state agency it must have authority to litigate and freedom from the control of other state agencies or officers." *Id.*

Plaintiff DRO is designated by the Governor of the State of Ohio as the P & A system for individuals with disabilities in Ohio. *Exec. Orders 2012-05K* and *2015-10K*; Ohio Rev. Code § 5123.60-601. DRO is a non-profit corporation incorporated in the state of Ohio with its headquarters in Columbus, Ohio.

Defendant Buckeye Ranch is a non-profit corporation incorporated in the state of Ohio with its principal office in Grove City, Ohio. Buckeye Ranch provides mental health, drug and alcohol treatment, and other services to children and families, both through day services and a residential facility. Some of the children served may be subject to charges under the criminal laws of Ohio. Buckeye Ranch houses over 80 youth on average in its residential program, impacting more than 4,800 children and families each year. (Second Am. Compl. at 1, ECF No. 24, Case No. 2:18-cv-906.)

Buckeye Ranch's residential treatment facility is licensed by the State of Ohio Department of Mental Health and Addiction Services ("Ohio Department of Mental Health") and is a certified mental health agency. Buckeye Ranch is obligated to report any allegation of abuse and neglect to the Ohio Department of Mental Health in accordance with Ohio Revised Code § 2151.421. Buckeye Ranch avers that "[t]hese reports usually involve physical restraints of the children by staff." *Id.* ¶ 14. Buckeye Ranch states that it files approximately seventy of these reports each year. *Id.* ¶ 15.

The parties do not dispute that Buckeye Ranch is a facility subject to the P & A Acts. Nor do the parties dispute that the youth at Buckeye Ranch are protected by the P & A Acts, and that the individuals who are the subjects of the reports of abuse and neglect at issue in this action are wards of the state, as are nearly all the youth at Buckeye Ranch.

## II.

The facts relied upon in this decision are found in the complaints filed by the parties in this case and the related case of *Buckeye Ranch v. DRO*, Case No. 18-cv-906, the parties' briefs, the testimony and documentary evidence offered with the briefing and at the Preliminary Injunction Hearing held February 20, 2019. (DRO's Second Am. Compl., ECF No. 34; Buckeye Ranch's Second Am. Compl., ECF No. 24 in Case No. 2:18-cv-906; DRO's Mot. for Prelim. Inj., ECF No. 7; DRO's Supp. Mem. to Mot. for Prelim. Inj., ECF No. 9; Buckeye Ranch's Mem. in Opp. to Mot. for Prelim. Inj. and Supp. Mem., ECF No. 10; Brief of DRO, ECF No. 12, Brief of Buckeye Ranch, ECF No. 13; DRO's Second. Supp. to Mot. for Prelim. Inj., ECF No. 15; DRO's Supp. Decl., ECF No. 17; Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj., ECF No. 18.)

Additionally, while the Court has not determined whether to permit amici curiae, it has reviewed the briefing filed by those requesting to participate and taken into consideration any relevant argument made in the briefs. (Mot. of Acadia Healthcare Co., Inc. to Appear as Amicus Curiae in Support of Buckeye Ranch, ECF No. 19; DRO Mem. in Opp. to Mot. to Appear as Amicus, ECF No. 25, Reply in Support of Amicus Appearance, ECF No. 27; Mot. of Ohio Children's Alliance, Beech Brook, Hittle House, New Beginnings Residential Treatment Center, And St. Joseph Orphanage to Appear as Amici Curiae, ECF No. 49.)

4

The issues before the Court are based upon five incident reports received by DRO from the Ohio Department of Mental Health regarding the use of restraint techniques on four youth at Buckeye Ranch. DRO began investigations into these reports, asking Buckeye Ranch for video footage and certain records, which was provided. DRO has also requested additional records and interviews with the four individuals who were the subjects of these reports of abuse and neglect. Buckeye Ranch refused to provide some of the requested documents and denied DRO unaccompanied access to the subjects of the incident reports until it was able to obtain consent from the government agencies that are the legal guardians of the youth, which it was not able to obtain for all the youth.

## III.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). In the Sixth Circuit, an "injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard.'" *Id.* (citing *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1998)).

## IV.

DRO contends it has shown that it is likely to succeed on the merits of its claim that Buckeye Ranch is violating the P & A Acts by not providing it reasonable unaccompanied access to the youth who are the subjects of the reports of abuse and neglect, by not providing the

requested additional records related to its investigation of those youth, and by not providing records of other restraints that have been documented within a particular time period.

Buckeye Ranch responds that DRO cannot show that it is likely Buckeye Ranch has violated or is violating the P & A Acts because (A) there was no statutory authority for DRO to even begin an investigation of the reports of abuse and neglect of the four youth who reside at Buckeye Ranch, (B) Buckeye Ranch provided all of the documents it was required to provide to DRO, and (C) Buckeye Ranch provided the required access to the youth who are the subjects of the reports of abuse and neglect.

## A.    Statutory Directive to Investigate Incidents of Abuse and Neglect

The P & A Acts provide the authority for a P & A system, like DRO, to "investigate incidents of abuse and neglect of persons with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 10805(a)(1)(A). As such, both DRO and Buckeye Ranch agree that DRO is within its federal mandate to commence an investigation of abuse and neglect (1) "if the incidents are reported to" DRO, "or" (2) "if there is probable cause to believe that the incidents occurred." *Id.* Buckeye Ranch argues that, while only one of these triggering events is necessary, neither occurred.

There is no dispute that DRO received from the Ohio Department of Mental Health five reports of abuse and neglect of four youth who reside at Buckeye Ranch. DRO opened investigations into these reports. Buckeye Ranch contends that DRO exceeded its statutory authority by opening these investigations because the P & A Acts require that "a report be made *to* the P & A System" directly, by for instance a parent or the youth him or herself, instead of coming from another agency. (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 9, ECF No. 18.) Buckeye Ranch maintains that its mandatory "self-reports [to the Ohio

Department of Mental Health] were not made to DRO and therefore are not complaints for triggering DRO's right to investigate." *Id.*

DRO responds that the P & A Acts do "not confine the obligation and right of P & A's to conduct investigations based on the source of the report of abuse and neglect," and that "[n]o common sense reading of the language of the statute can lead to the insertion of such a restriction." (DRO's Second. Supp. to Mot. for Prelim. Inj. at 9–10, ECF No. 15.) This Court agrees.

Neither the statutory and regulatory scheme nor the case law provides any support for the proposition that the P & A system must treat differently reports of abuse and neglect based upon the source of the report. Indeed, DRO's receipt of reports of abuse and neglect from the Ohio Department of Mental Health is the exact same procedure this Court has previously accepted as sufficient to constitute incidents reported *to* a P & A system. In *Ohio Legal Rights Services v. Buckeye Ranch, Inc.*, 365 F. Supp. 2d 877, 883 (S.D. Ohio 2005) ("*Ohio Legal Rights*"), the precursor agency to DRO commenced an investigation based on reports it received from the Ohio Department of Mental Health.

Moreover, this process of not differentiating the reports of abuse and neglect by their source is supported by the Department of Health and Human Services ("DHHS") in the Final Rule, which provides in relevant part:

> The Act states that a P & A system has the authority to investigate incidents of abuse and neglect that are either reported to the system or where there is probable cause to believe that the incidents have taken place. The Department believes that *media accounts and newspaper articles can be viewed as the equivalent of a complaint* when they provide details about a specific incident of abuse or neglect. *While such reports are not specifically directed at the P & A system*, they are published with the expectation that public officials responsible for conditions will act to stop abuse. P & A systems have that role. This does not preclude a P & A system from acting on behalf of an unnamed client or on behalf of a class of people.

*Substance Abuse and Mental Health Services Administration; Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness*; Final Rule, 62 FR 53548-01 at 53551 (emphasis added). If media reports not specifically directed at a P & A system are sufficient to constitute a report to the P & A, certainly reports from a governmental agency are also adequate.

Finally, this conclusion is also in accord with the P & A Acts' purpose of protecting some of society's most vulnerable members. As DRO appropriately highlights, while the youth with disabilities in facilities like Buckeye Ranch "are particularly vulnerable, they have fewer natural supports in place because they have limited contact with their families and support systems," causing, *inter alia*, many of them to be "unaware of their rights and unfamiliar with DRO's role as the P & A Agency." (DRO's Mot. for Prelim. Inj. At 5, ECF No. 7.)

Thus, regardless of the source of the reports of abuse and neglect obtained by the P & A system, it has been given the statutory authority to investigate those reports. 42 U.S.C. § 10805(a)(1)(A). Accordingly, the reports of abuse and neglect DRO received from the Ohio Department of Mental Health triggered DRO's statutory right and obligation to investigate those reports.

**B.    Access to Records**

Initially, the Court notes that Buckeye Ranch has appropriately and timely provided many of the records DRO has requested, including video recordings of the events. Both Buckeye Ranch and DRO appear to sincerely desire to meet their obligations of providing services to the youth who reside at Buckeye Ranch. The Court encourages the parties to continue to work together, which should prove an easier task once there is in this case a determination of rights and obligations under the P & A Acts.

8

DRO contends that it is substantially likely to succeed on the merits of its claim that Buckeye Ranch is violating the P & A Acts by failing to provide DRO access to all of the records it has requested as part of its investigation of the reports of abuse and neglect at Buckeye Ranch. DRO asserts that it is entitled to the records it seeks based on its authority to conduct investigations of abuse and neglect under the P & A Acts. DRO maintains that the records it requests are incident to and/or directly related to reports of abuse and neglect DRO has received, or that have been conveyed to DRO's investigator during the investigations. There are two categories of documents DRO requests: (1) records related to the four individuals who are the subjects of the incident reports, and (2) records of the facility not directly related to the subjects of the incident reports.

### 1.    Records Related to the Four Subjects of the Reports of Abuse and Neglect

Buckeye Ranch posits that it "has provided to DRO all records regarding the individuals who are the subject of the self-reported incidents and the video footage available for the described incidents," and that it is not required to provide any of the remaining documents DRO has requested. Both parties agree that subsection (a)(4) of 42 U.S.C. § 10805 applies to this issue:

> **(a)(4)** in accordance with section 10806 of this title, [P & A systems] have access to all records of---
>
> **(A)** any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;
>
> **(B)** *any individual* (including an individual who has died or whose whereabouts are unknown)—
>
> > **(i)** who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;
> >
> > **(ii)** *who does not have a legal guardian*, conservator, or other legal representative, *or for whom the legal guardian is the State*; and

9

**(iii)** with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is *probable cause* to believe that such individual has been subject to abuse or neglect; and

**(C)** any individual with a mental illness, *who has a legal guardian*, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is *probable cause* to believe the health or safety of the individual is in serious and immediate jeopardy, whenever—

> **(i)** *such representative has been contacted* by such system upon receipt of the name and address of such representative;
>
> **(ii)** such system has offered assistance to such representative to resolve the situation; and
>
> **(iii)** such representative has failed or refused to act on behalf of the individual;

42 U.S.C. § 10805(a)(4) (emphasis added).

Based upon its reading of this statute, Buckeye Ranch contends:

> Once an investigation is triggered by a complaint, DRO must clear two hurdles established by law to access records of The Buckeye Ranch. DRO must establish [(a)] it has consent from the individual or guardian to review the records unless one of the expressed exceptions exist – either there is no guardian and DRO has probable cause to believe the individual *has been* abused or neglected or the guardian has refused to act and [(b)] DRO has probable cause to believe the safety or health of the individual is in *serious and immediate jeopardy. Disability Rights Wis., Inc. v. State Dept. of Pub. Instruction*, 463 F.3d 719, 726 (7th Cir. 2006).

(Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 11, ECF No. 18.)

### a.   Consent

Buckeye Ranch argues that the first hurdle that DRO must clear before it is entitled to the records it requests is obtaining consent from the county children's services agency, which is the

10

legal guardian of the youths who are the subjects of the complaints.[2]  DRO responds that it is not required to obtain consent because these youth are wards of the state.  DRO contends that Buckeye Ranch misreads the statute, conflating the requirements in sub-section (B) with those in sub-section (C).  The statute, DRO maintains, groups together in sub-section (B) individuals who do not have guardians or whose guardian is the state, and in sub-section (C) those who do have a legal guardian.  DRO argues that for the former group, the statute does not require that a P & A system obtain consent to have access to its records.  This Court agrees.

Section (a)(4)(B) of 42 U.S.C. § 10805 provides that P & A's shall "have access to all records of . . . an individual . . .who *does not have* a legal guardian . . . *or for whom the legal guardian is the State.*" 42 U.S.C. §10805(a)(4)(B)(ii) (emphasis added).  The next section of the statute then addresses an individual who *does* have a legal guardian.  *See* 42 U.S.C. §10805(a)(4)(C).  The only part of the statute that addresses those whose legal guardian is the state, § 10805(a)(4)(B)(ii), sets forth no requirement that there be the consent of, or even contact with, the agency of the state that is the guardian.  *See Alabama Disabilities Advoc. Program v. SafetyNet Youthcare, Inc.*, 65 F. Supp. 3d 1312, 1318 (S.D. Ala. 2014), *judgment entered,* CIV.A. 13-0519-CG-B, 2014 WL 7146444 (S.D. Ala. Dec. 15, 2014), and *on reconsideration in part,* CVI.A. 13-0519-CG-B, 2015 WL 566946 (S.D. Ala. Feb. 11, 2015)  ("*Alabama Disabilities Advocacy*") ("P & A access to the records of individuals with mental illness or disabilities is also authorized; and, in certain situations, a P & A may access records without consent of either the individual or her legal guardian. 42 U.S.C. §§ 10805(a)(4); 15043(a)(2)(I).").

---

[2] The Court views guardianship by the "state" as the same as guardianship in the hands of a county children's services agency, as in this case.

Even the case relied upon by Buckeye Ranch supports this reading of the statute. *See Disability Rights Wisconsin, Inc. v. State of Wisconsin Dept. of Pub. Instr.*, 463 F.3d 719 (7th Cir. 2006) ("*Disability Rights Wisconsin*"). In *Disability Rights Wisconsin*, the court made clear that under § (a)(4)(B) there is no requirement of consent, and only the requirement of probable cause, stating: "In circumstances where an individual has no parent or guardian, the P & A agencies may access records so long as they have probable cause to believe that abuse has occurred." *Id.* at 726 (citing 42 U.S.C. § 10805(a)(4)(B); 42 U.S.C. § 15043(a)(2)(I)(ii); 29 U.S.C. § 794e(f)(2)).

### b. Probable Cause

DRO determined that it had probable cause to believe that the four individuals who were the subjects of the reports may have been abused or neglected. DRO contends that it "is the final arbiter of the existence of probable cause, and that DRO may not be second-guessed by the facilities and organizations that it investigates." (DRO's Second. Supp. to Mot. for Prelim. Inj. at 11, ECF No. 15.)

Buckeye Ranch responds that the probable cause finding must be supported by facts pointing to the abuse of a specific individual. It continues, asserting that "this 'probable cause' serves as a constitutionally adequate substitute for a warrant, and therefore the PAIMI must be construed narrowly to provide 'certainty and regularity in its application.'" (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 13, ECF No. 18) (citing *Disability Law Center v. Discovery Academy*, No. 2:07-cv-755, 2010 U.S. Dist. LEXIS 410, at *10 (D. Utah, Jan. 5, 2010) ("*Disability Law Center*"). Further, Buckeye Ranch asserts that

> DRO's insistence that it is the "sole arbiter" of whether there is probable cause also ignores all known rules of statutory construction. If the DRO is correct, there would be no need to include a requirement for "probable cause" as it would be meaningless. If Congress intended the DRO to have access to any record or

individual it wanted to interview why write in a requirement for probable cause. As DRO points out in its own brief, "[a] cardinal principle of statutory construction is that the court must give effect 'to every clause and word of a statute." ECF No. 15, PageID #114 citing *Conn. Office of Prot. & Advocacy v. Hartford Bd. Of. Educ.*, 464 F.3d 229, 241 (2nd Cir. 2006).

. . . .

Additionally, these self-reports were investigated at the county level. None of these independent agencies substantiated any abuse or neglect. DRO does not have a "reasonable ground" for believing that these individuals [who] are the subject of self-reports are at *significant risk* of abuse or neglect given that independent investigations have already concluded that no abuse or neglect occurred.

(Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 12, 14, ECF No. 18.)

Buckeye Ranch's arguments are not well taken.

First, as to the arbiter of probable cause, this Court has recognized:

It is well-settled that a protection and advocacy system is the "final arbiter of probable cause for the purpose of triggering its authority to access all records for an individual that may have been subject to abuse or neglect." *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689, 693 (D. Ariz. 2000); *see also [Protec. & Advoc. for Persons with Disabilities v.] Armstrong*, 266 F.Supp. [302,] 321 [(D. Conn. 2003)]; *Center For Legal Advocacy v. Earnest*, 188 F.Supp. 2d 1251, 1257 (D. Colo. 2002); *Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F.Supp.2d 1150, 1157 (N.D. Iowa 2001).

*Ohio Leg. Rights*, 365 F. Supp. 2d at 887. "This position has been overwhelmingly agreed with by other courts." *Disability Rights Idaho*, 168 F. Supp. 3d at 1297 (citing as examples *Iowa Prot. and Advocacy Services, Inc. v. Rasmussen*, 206 F.R.D. 630, 638 (S.D. Iowa 2001) ("the statute is clear that it is the protection and advocacy systems that shall make the relevant probable cause determination, as a result of its 'monitoring and other activities,' and *not* a state agency.") (emphasis in original); *Gerard Treatment Programs*, 152 F. Supp. 2d at 1159; *Tarwater*, 97 F.3d at 494–95; *Armstrong*, 266 F. Supp. 2d at 321; *Prot. & Advocacy System, Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1219 (D. Wyoming 2006); *Ohio Legal Rights*, 365 F. Supp. 2d at 887).

As a sister district court explains:

> The regulations promulgated by the U.S. Department of Health and Human Services specifically contemplate that the P & A will make the determination of whether probable cause exists. *See* 42 C.F.R. § 51.41(b)(iii) ("the P & A system has determined that there is probable cause to believe that the individual has been or may be subject to abuse or neglect"); 45 C.F.R. § 1386.22(a)(2)(iii) ("the system has probable cause . . . to believe that such individual has been subject to abuse or neglect"); *see also* 42 C.F.R. § 51.31(g) (P & A system may determine probable cause from monitoring and other activities). Neither the P & A laws nor the regulations promulgated thereunder contemplate that the state or a service provider will reevaluate the P & A's determination of probable cause and deny access to the P & A because the state or service provider disagrees that probable cause exists.

*Arizona Center for Disability Law,* 197 F.R.D. 689, 693 (D. Ariz. 2000).

Buckeye Ranch's argument regarding statutory interpretation in this regard is unpersuasive. (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 14, ECF No. 18.) Simply because a P & A system evaluates whether there is probable cause to investigate reports of abuse and neglect does not excise the requirement from the statute nor render any part of the statute meaningless. The requirement of probable cause to believe that the incidents occurred is given effect by requiring that a P & A make that determination.

The Court notes that Congress enacted numerous qualification provisions for P & A systems so that the important decisions, such as probable cause to trigger an investigation, are made by qualified agencies. For example, each state's P & A system must have a "governing authority responsible for its planning, designing, implementing and functioning," including the setting of annual "[p]rogram priorities and policies." 42 C.F.R. §§ 51.22(a), 51.24(a). In addition, a P & A system must establish an "advisory council" that is charged with, among other responsibilities, "[p]rovid[ing] independent advice and recommendations to the [protection-and-advocacy] system" and "[w]ork[ing] with the [system's] governing authority in the development of policies and priorities." 42. C.F.R. § 51.23(a).

Further, a P & A system's determination of probable cause is not analogous to that required in the investigation and prosecution of crimes. No P & A can charge a facility with a crime and must rely upon state and federal agencies to take action in that respect, certainly after making their own probable cause determination. There is no suggestion that DRO is a subterfuge for a law enforcement agency. As a consequence, "[t]he standard for finding that probable cause exists is lower for these purposes than it would be in the context of a criminal investigation." *State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F.Supp.2d 649, 661 (D. Conn.2005) "(*Hartford*") (citing *Tarwater*, 97 F.3d at 498–99). The PAIMI Act's implementing regulations set forth the definition of "probable cause," how probable cause is to be determined, and what consequences follow from a finding of probable cause. 42 C.F.R. §§51.2, 51.31(g). In light of the explicit definition of "probable cause" for purposes of the PAIMI Act, the standard Fourth Amendment definition of "probable cause" does not apply to the access rights of P & A systems such as DRO. *See* 42 C.F.R. § 51.2 (defining "probable cause" for purposes of the PAIMI Act).

As Buckeye Ranch itself recognizes, "several courts have concluded that PAIMI does not violate the Fourth Amendment . . . ."[3] (Buckeye Ranch's Opp. to DRO Second Supp. to Mot.

---

[3] Buckeye Ranch, however, does argue that neither a court that has found the P & A Acts constitutional under the Fourth Amendment, nor any other court, has "considered its interference with a person's rights under the Fifth Amendment." (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 23, ECF No. 18.) DRO has not had the opportunity to address this argument, which Buckeye Ranch first raised in the last brief filed. Additionally, under Federal Rule of Civil Procedure 5.1, when a party files a pleading or motion "drawing into question the constitutionality of a federal . . . statute," and no federal agency or official is a party to the case, the filing party "must promptly: (1) file a notice of constitutional question stating the question and identifying the paper that raises it," and "serve the notice and paper on the Attorney General of the United States." Fed. R. Civ. P. 5.1(a)(1). The Attorney General may then intervene within 60 days after the notice is filed or after the court certifies the challenge, unless the court sets a later time. *Id.* 5.1(c).

for Prelim. Inj. at 23, ECF No. 18.) Indeed, Courts regularly find the lower constitutional

standard for agency investigations is met by the P & A Acts' requirements of (1) receipt of a

report of abuse and neglect or (2) a probable cause finding. The *Disability Law Center* court

explains that these two requirements "in the statute and the regulations implementing it are

necessary to avoid warrantless searches that are otherwise prohibited by the Fourth Amendment

to the United States Constitution." *Disability Law Ctr.*, 2:07-cv-755, 2010 U.S. Dist. LEXIS 410

at *10, 2010 WL 55989 ("PAIMI meets the[] requirements [of 'certainty and regularity in its

application' and 'a constitutionally adequate substitute for a warrant] by imposing a requirement

for either a complaint or a finding of probable cause as to a specific individual.").

Moreover, because the investigations are constitutionally sound under the Fourth

Amendment, the statute does not require review by this Court of DRO's determination that there

was probable cause to believe that the four youth who are the subjects of the reports may have

been abused or neglected. As the *Disability Rights Idaho* court explained:

> The [facility] also suggests this Court is ultimately the final decision-maker
> regarding whether probable cause exists, and offers the Court the opportunity to
> review the investigatory records of D.T.'s death *in camera* to assist with this
> determination. (Dkt. 32-1, p. 4, n. 5; p. 7, n. 9.) The [facility] does not provide any

---

In the instant action, no notice under Rule 5.1 has yet been served on the Attorney
General regarding the constitutional challenges made by Buckeye Ranch. DRO filed a *Notice*
indicating that because no notice was provided pursuant to Rule 5.1, it "provided information on
this case to officials at the U.S. Department of Health and Human Services, which administers
the P & A programs under the" P & A Acts. (Notice at 1, ECF No. 52.) Since then, the United
States has filed a *Notice of Potential Participation*, indicating that it may seek to intervene to
defend the constitutionality of the P & A Acts. (ECF No. 53.) While this Court may reject the
constitutional challenges without formal notice, certification, and the opportunity for the
Department of Justice and/or the Ohio Attorney General to intervene, a ruling finding any of the
statutes to be unconstitutional would be premature. Consequently, the Court will not herein
address Buckeye Ranch's arguments related to the Fifth Amendment.

authority to support its contention that the Court is the final decision-maker regarding probable cause.

> Moreover, cases interpreting PAIMI have repeatedly held that a P & A's probable cause determination does not require judicial review. *Armstrong*, 266 F.Supp.2d at 321 ("[C]ourts have rejected attempts to require judicial review of the P & A's probable cause determination") (citations omitted); *Stalder*, 128 F. Supp. 2d at 367 (state policy of requiring *in camera* inspection by a court before releasing records to the state P & A clearly conflicted with PAIMI, would undermine P & A's ability to investigate a claim and effectively advocate, and was preempted); *Maryland Disability Law Ctr., Inc. v. Mt. Washington Pediatric Hosp., Inc.*, 106 Md. App. 55, 664 A.2d 16, 24 (1995) (finding it would be overly burdensome and unnecessary to require a P & A to convince the court that probable cause exists prior to having access to patients, personnel and records). The Court accordingly declines the [facility]'s invitation to review [Disability Rights Idaho]'s probable cause determination.

168 F. Supp. 3d at 1298. This Court agrees with these cases and finds that the P & A Acts do not require a P & A system to convince a court that probable cause exists prior to having access to the individual subjects of the reports, their records, and the personnel and other residents who may have knowledge or information of these reports of abuse and neglect.

Finally, Buckeye Ranch offers the purported results of other investigations to support its contention that DRO did not appropriately find probable cause sufficient to obtain the requested records pertaining to the investigation of abuse and neglect of the four youth. Buckeye Ranch asserts that these other investigations found the reports of abuse and neglect unsubstantiated. DRO responds that "[a]lthough [Buckeye Ranch] alleges that there have been investigations of the incidents by state and county agencies, and that they have found that the allegations of abuse are not substantiated, [Buckeye Ranch] has provided to neither DRO nor the court any evidence that such investigations occurred, and that they led to findings that the allegations were not substantiated." (DRO's Mot. for Prelim. Inj. at 9, ECF No. 7.)

It is, however, of no moment that other county or state agencies investigated these reports of abuse and neglect, regardless of the outcome of the investigations. "Congress enacted PAIMI

as an 'independent check' on existing state systems designed to investigate abuse and neglect of the mentally ill." *Disability Rights Idaho*, 168 F. Supp. 3d at 1292 (citing *Rasmussen*, 206 F.R.D. at 639 [("Protection and advocacy systems are established as independent checks on state care and regulation of care for dependent adults.")]; 42 U.S.C. § 10801(a)(4)).

Accordingly, the Court finds that DRO is likely to succeed on the merits of its claim that it is statutorily mandated under the P & A Acts to make the probable cause determination for the purpose of triggering its authority to access all records for an individual who may have been subject to abuse or neglect. Therefore, DRO is entitled to the remainder of the records it requests related to the investigation of these five reports of abuse and neglect. These records include the requests for grievances and complaints made by the youth, restraint logs and denial of privileges logs of the youth, information regarding the staff involved in the incidents, and video recordings of the hour before and after the reported incidents.

### 2.   Records Not Directly Related to the Subjects of the Reports of Abuse and Neglect

Thus far, the Court has addressed the investigation of individuals who were the subjects of complaints or reports of abuse and neglect. In this next section, the parties move to a different category of records. Specifically, DRO contends that through its investigation, it has determined that not only is there probable cause to believe that the individuals who were the subjects of the reports were exposed to abuse and neglect, but also that there is widespread and systemic abuse at Buckeye Ranch. DRO, therefore, requests certain records that would provide information about the use of restraints on youth at Buckeye Ranch for whom DRO does not have a complaint or report. For example, DRO requests for a particular period of time that encompasses the period of time that incidents of abuse and neglect occurred for which it does have reports, the restraint

logs, logs reflecting denial of privileges, peer review logs, video recordings of an entire day, and information about the staff who were involved in the restraints.

Buckeye Ranch argues that "records that pertain to other children as well as general operations and policies of The Buckeye Ranch. . . . are not records available to the DRO under the PAIMIA or Ohio law." (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 15, ECF No. 18.) Buckeye Ranch explains its position:

> The records to which a P & A system has access under this section are "records of any individual." 42 U.S.C. §10805(a)(4). PAIMIA does not authorize all records of the facility. The premise that "records" means records of an "individual" is further enforced in 42 U.S.C. §10806 where the P & A system must maintain the records in utmost confidence and is prohibited from even disclosing them to the "individual who is the subject of the information" in certain situations. §10806(a) and (b).

*Id.* (citing also 42 U.S.C. §10805; 42 CFR 51.41).

Buckeye Ranch relies upon *Disability Law Center* for the proposition that the statute does not require provision of the records requested by DRO because "[t]hey are neither directed to an individual or even an identified incident." *Id.* at 17.

> The focus of the statutory protection is upon the protection of individuals for whom there is either a complaint or a finding of probable cause to believe 'such individual' has been subjected to abuse. Nothing in the statute suggests a general investigative power absent reference to an identified individual.

*Disability Law Ctr.*, 2:07-CV-511, 2010 WL 55989, at *3. Buckeye Ranch continues:

> Indeed the [P & A]'s attempt to expand the scope of the investigation to general operational misconduct without identifying the individuals about whom it is concerned or even a factual basis to believe incidents of abuse and neglect are occurring exceeds the carefully crafted limitations imposed in the PAIMI and thus exceeds the authority granted to the [P & A] by the statute.

(Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 13, ECF No. 18)

(quoting *Disability Law Center*, 2010 WL 55989 at *6).

*Disability Law Center* is inapposite in this regard. That is, the P & A system in that case investigated one individual who denied most of the allegations and was removed from the facility immediately after the report. That court relied heavily on its assessment that the P & A failed to "provide supporting evidence that it has received complaints about other individual students at the Academy [and failed to] provide a factual basis to support that it has probable cause to believe any other specific individual at the Academy with mental illness is suffering from neglect or abuse." *Id.* at *2.

In the case *sub judice*, DRO received complaints about abuse and neglect of four individuals and has identified a factual basis (discussed below) to believe incidents of abuse and neglect are occurring at Buckeye Ranch. In this situation, the Court is more persuaded by the Third and Tenth Circuits' positions related to the requested records as stated in *Disability Rights Idaho*:

> The Third Circuit interpreted § 10805 expansively in *Pennsylvania Prot. & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 427 (3d Cir. 2000), and determined a state P & A was entitled to peer review reports prepared by a hospital despite the hospital's contention that such reports were not "records of any individual" under § 10805 because peer review reports belong to the hospital, and not to an individual patient. The Court rejected the hospital's contention, and determined the preposition "of" in § 10805 "may be used to show connection or association as well as ownership, and it seems clear that the term is used in the former sense here." (citation omitted). The Third Circuit determined the state P & A was entitled to peer review reports prepared by a hospital, despite the hospital's contention that such reports were not records "of any individual," because peer review reports pertain to a patient, regardless of whether they were prepared by a hospital. *Id.* at 427.

> In *Ctr. for Legal Advocacy v. Hammons*, 323 F.3d 1262 (10th Cir. 2003), a facility similarly denied a P & A access to peer review and quality assurance records. The facility in *Hammons* argued § 10805 of PAIMI grants access to all records of patients, which do not include peer review or quality assurance records, and § 10806 grants access only to certain records of hospitals and agencies, so that § 10805's arguably expansive language (providing access to "all records of . . . any individual") is inapplicable to § 10806, and does not compel the conclusion that peer review and quality assurance records are hospital records under § 10806. *Id.*

at 1267. The Tenth Circuit rejected this interpretation of the statute, finding Colorado's P & A should have access to peer review and quality assurance records. In so holding, the Court explained:

> We begin by noting that the statutory phrase 'all records of . . . any individual' is quite broad. While defendants urge us to follow the district court and find that this addresses only 'patient records,' and not 'hospital records,' and peer review and quality assurance records are not 'patient records' because they do not 'belong' to the patient, we agree with the Third Circuit's observation that 'of' in this context need not be read so narrowly. Thus, a rational reading is that it refers to records pertaining to or relating to an individual. . . Peer review or quality assurance records involving the care of an individual could easily fit within that definition of records, *along with myriad other records relating to an individual and/or his or her care. Id.* at 1270 (citing *Houstoun,* 228 F.3d at 427) (emphasis added by *Disability Rights Idaho* court).

168 F. Supp. 3d at 1292–93.

Additionally, the Court lays to rest Buckeye Ranch's confidentiality concerns related to its production of the requested records. As the Seventh Circuit has explained, P & A systems, because of their "special function. . . . to serve individuals with disabilities or mental illness," are "under an especially significant duty of confidentiality." *Disability Rights Wisconsin,* 463 F.3d at 728 (citing as example *Wis. Coalition for Advocacy v. Czaplewski,* 131 F. Supp. 2d 1039, 1052 (E.D. Wis. 2001) (noting that nursing home patients would suffer no privacy harm because "federal law requires that WCA, as the Protection & Advocacy system, keep such records confidential")). In reversing the district court's finding that the P & A was not entitled to records based upon privacy concerns, the *Disability Rights Wisconsin* court explained in detail this duty of confidentiality, stating first that "[s]pecific provisions of the federal P & A statutes . . . bar P & A agencies from disclosing information obtained from client records to unauthorized parties." *Id.* at 728 (citing 45 C.F.R. § 1386.22(e)(1)-(3)). The court highlighted that P & A systems "specialize[] in the protection of persons with disabilities and mental illness, and confidentiality

is a key aspect of protection." *Id*. Reviewing the case law on the confidentiality issue, *Disability*

*Rights Wisconsin* opined:

> The district courts, in particular, have been remarkably active and consistent in construing PAIMI's duty of confidentiality. The clear message of these cases is the conclusion that the duty of confidentiality should be deemed to require P & A agencies to maintain the confidentiality of records regardless of their technical classification. *See, e.g., Protection & Advocacy Sys., Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1215–16 (D. Wyo. 2006); *State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 663–64 (D. Conn. 2005); *Advocacy Ctr. v. Stalder*, 128 F. Supp. 2d 358, 366 (M.D. La.1999); *see also Ala. Disabilities Advocacy Prog.*, 97 F.3d at 497, 499. PAIMI might be one source of the duty of confidentiality, but it is not the only one. The P & A agencies' nature as protectors of individuals with disabilities or mental illness is critical and not to be overlooked. *See Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, LLC*, 152 F. Supp. 2d 1150, 1160–61 (N.D.Iowa 2001) (discussing PAIMI's duty of confidentiality and concluding that a guardian's expressed unwillingness to authorize a P & A agency to access records does not necessarily preclude that access).

*Id*. at 729.

This Court too, finds the "reasoning underlying these cases [] persuasive" and likewise

concludes that DRO "is subject to the same strictures of confidentiality as" Buckeye Ranch. *Id*.

"Given the duty of confidentiality common to both organizations, [DRO]'s possession of the

information seems no more troubling as a privacy matter than [Buckeye Ranch]'s possession."

*Id*.

The Court is unpersuaded by Buckeye Ranch's argument that this Court, in *Ohio Legal*

*Rights*, denied access under PAIMIA of the "myriad of operational records" DRO's predecessor

sought in a similar factual situation to the instant action. In that case, this Court explained:

> [P & A] OLRS presented its requests for access to the logs as part of an attempt to collect data for a statewide database on the use of seclusion and restraint techniques.
>
> The Court agrees with the Buckeye Ranch. Upon reviewing the letters sent by OLRS to the Buckeye Ranch, *the Court finds that OLRS based its requests on a need to "develop a statewide seclusion and restraint baseline."* Defs.' Mot. to Dismiss, Ex. A. There is *no evidence* that, at the time it made its requests, OLRS

had determined *there was probable cause* to believe that abuse or neglect had occurred at the Buckeye Ranch. Ms. Knight's finding of probable cause was based in part on the *Cincinnati Enquirer* articles, which were published after OLRS had already made several requests for the logs. Even once the articles were published, OLRS never conveyed to the Buckeye Ranch its determination that probable cause existed to believe one or more children had been abused or neglected during incidents of seclusion and restraint.

The Court is certainly aware of OLRS's important mission of defending mentally-ill individuals from abuse and neglect. Nonetheless, OLRS's requests for the seclusion and restraint logs were not based on a finding of probable cause. It is unclear exactly when OLRS did find probable cause, but the Buckeye Ranch was not informed of it. The Buckeye Ranch cannot be faulted for refusing to produce the logs when it did not know OLRS had probable cause to believe that incidents of abuse or neglect had occurred.

*Ohio Leg. Rights*, 365 F. Supp. 2d at 887–88. In other words, this Court found that the P & A was not entitled to the requested records because it had not determined there was probable cause to believe incidents of abuse and neglect had occurred. That is not analogous to the situation currently before the Court; DRO has made such a determination.

This brings the Court to Buckeye Ranch's argument that providing DRO with the requested documents, with no available review, may raise constitutional concerns. Buckeye Ranch relies upon the explanation provided by *Disability Law Center*:

To accept the [P & A]'s argument [that "the Academy has no recourse to prevent what may be an unwarranted investigation"] would require the court to interpret the law as allowing an advocacy center to determine, without any checks or balances of its demand, when it may conduct what is effectively a search and seizure of the defendants' records and information. To find that the PAIMI would authorize such unlimited discretion in the [P & A] would raise the constitutional concerns addressed in *Donovan*. In that case the Court upheld the constitutionality of warrantless regulatory searches, in part, because the act at issue did not allow forcible entries and the subject of the search had recourse to the federal district court should the requested search exceed constitutional limits.

*Disability L. Ctr. v. Discovery Acad.*, 2:07-CV-511, 2010 WL 55989, at *6 (*Donovan v. Dewey*, 452 U.S. 594, 604–05 (1981)).

To alleviate this concern, this Court concludes that when seeking records that relate to a facility or other individuals in the facility who were not the initial subjects of the report of abuse or neglect, a P & A is required to articulate to the facility the bases of its finding of probable cause to believe there is a systemic problem or other specific individuals have been subjected to abuse or neglect. If the parties cannot agree as to whether there is probable cause sufficient to necessitate the production of the requested documents, they may seek judicial review.

This conclusion satisfies any constitutional concerns, as well as Buckeye Ranch's contention that the DHHS, in its Final Rule, states that it "does not have the authority, by regulation, to insulate a P & A system from having to articulate the basis of its probable cause determination when requested." *Substance Abuse and Mental Health Services Administration; Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness*; Final Rule, 62 FR 53548-01 at 53551. *See also Iowa Protec. and Advoc.*, 152 F. Supp. 2d 1150 (explaining that, although P & A systems are the final arbiters of whether probable cause existed to believe that residents of psychiatric medical institution were in jeopardy of abuse or neglect, and consequently, institution could not refuse access to patients and records under PAMII Act and PADD on the ground that no probable cause had been shown, institution was not barred from "seeking judicial review of the sufficiency of [P & A]'s probable cause for its *expanded* investigation.).

Both parties have submitted the evidence utilized by DRO in concluding that it has a factual basis to believe that incidents of abuse and neglect are occurring at Buckeye Ranch. Unlike the P & A in *Disability Law Center* that "failed to come forward with any facts to support its determination that there was probable cause," the evidence before this Court provides such a basis. The Court has reviewed *in camera* the video evidence, and reviewed the documentary

evidence, as well as the testimony of all of the witnesses at the Preliminary Injunction hearing as to restraint and de-escalation techniques appropriate for the population at Buckeye Ranch. In the Court's view, this evidence is sufficient to support DRO's probable cause finding – under any standard Buckeye Ranch argues applies (from probable cause to believe that abuse has occurred 42 U.S.C. § 15043(a)(2)(I)(ii), 42 U.S.C. § 10805(a)(4)(B), 29 U.S.C. § 794e(f)(2) to probable cause to believe that an individual's health or safety is in serious and immediate jeopardy. 42 U.S.C. § 15043(a)(2)(I)(iii), 42 U.S.C. § 10805(a)(4)(C), 29 U.S.C. § 794e(f)(2)). Therefore, DRO is entitled to the records it requests as pat of its expanded investigation. The records must be limited to a reasonable time period.

**C.     Access to Youth**

DRO argues that it is likely to prevail on the merits of its claim that Buckeye Ranch is violating the P & A Acts by not permitting reasonable unaccompanied access to the youth residing at Buckeye Ranch. DRO continues, asserting that

> DRO has requested unaccompanied access to the youth who were the subjects of the complaints of abuse and neglect, as well as youth and staff who may have knowledge of the reports of the incidents of reported abuse and neglect. DRO contends that it is entitled to unaccompanied access "to allow Plaintiff DRO to fulfill its statutorily-mandated function of protecting and advocating for children through prompt and unimpeded investigation of reports of abuse and neglect."

(DRO's Second. Supp. to Mot. for Prelim. Inj at 3, ECF No. 15) (citing 42 U.S.C. § 10805(a)(1)(A)).

Initially, the Court notes that DRO no longer seeks to have access to randomly selected residents, which would entail a different analysis than the one herein. As to the current focus on investigations, DRO relies upon the implementing regulation, which provides in relevant part:

> (a) Access to facilities and residents shall be extended to all authorized agents of a P & A system.

(b) A P&A system shall have reasonable unaccompanied access to public and private facilities and programs in the State which render care or treatment for individuals with mental illness, and to all areas of the facility which are used by residents or are accessible to residents. *The P&A system shall have reasonable unaccompanied access to residents at all times necessary to conduct a full investigation of an incident of abuse or neglect.* This authority shall include the opportunity to interview any facility service recipient, employee, or other persons, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation. Such access shall be afforded, upon request, by the P & A system when:

> (1) An incident is reported or a complaint is made to the P&A system;
>
> (2) The P&A system determines there is probable cause to believe that an incident has or may have occurred; or
>
> (3) The P&A system determines that there is or may be imminent danger of serious abuse or neglect of an individual with mental illness.

42 C.F.R. § 51.42 (emphasis added).

DRO asserts, and this Court agreed *supra*, that an incident or complaint was made to DRO. And, DRO determined that there was probable cause to believe that the incent of abuse and neglect did or may have occurred. Thus, this regulation's triggering events have occurred and DRO must therefore be provided reasonable unaccompanied access to residents at all times necessary to conduct a full investigation of the incident reports.

DRO, however, avers that Buckeye Ranch "has insisted throughout Plaintiff DRO's attempts to investigate that DRO obtain the approval of county children's services agencies having custody before making children available for interviews, and have either denied or considerably delayed DRO's access to the children." (DRO's Second. Supp. to Mot. for Prelim. Inj. at 2, ECF No. 15) (citing Yoder Decl., ECF No. 15-2). DRO continues, declaring that in "some instances, children's services agencies have required that a representative of their agency

be present for the interviews, and Defendant [Buckeye Ranch] has declined to make these children available in the absence of representatives of the agencies." *Id.* DRO maintains that "[t]hese requirements have impeded DRO's investigation of reports of abuse and neglect. . . . [and therefore] [DRO] is not able to complete a timely investigation of very serious allegations of abuse and neglect." *Id.* at 2–3. DRO explains why, *inter alia*, its investigations are, in its view, significantly impeded:

> Children who may have knowledge of the incidents are being discharged from the facility before [DRO] has the opportunity to interview them. Once they are discharged, interviews with these children become more difficult to complete. The more time that passes, the less likely it becomes that the children will retain detailed information about the events.

*Id.* at 3.

Buckeye Ranch posits that DRO cannot show that it is likely to succeed on the merits of its claim that Buckeye Ranch is violating the P & A Acts by not permitting unaccompanied access to the youth because (1) the regulation that requires this unaccompanied access exceeds the regulatory agency's authority, and even if it did not, Buckeye Ranch is in compliance with the P & A Acts because (2) DRO's requests are unreasonable, and (3) Buckeye Ranch is required to obtain consent from the youths' guardians.

### 1.    Deference to the Regulations

Buckeye Ranch argues that the DHHS "exceeded its statutory authority in instituting 42 C.F.R. § 51.42 given that PAIMIA confers no such right of access to facility residents." (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 19, ECF No. 18.) This Court, however, disagrees.

DHHS "is charged with issuing regulations interpreting and implementing PAIMI." *Connecticut Office of P & A*, 464 F.3d at 239 (citing 42 U.S.C. § 10826). To determine whether

DHHS exceeded its authority, the first question is whether the plain language of PAIMI unambiguously grants the P & A system unaccompanied access to the youth. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984). If the statute does, the inquiry ends, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. An agency interpretation is reasonable if it is "rational and consistent with the statute." *Sullivan v. Everhart,* 494 U.S. 83, 89 (1990) (quotation marks and citation omitted).

Buckeye Ranch's argument in its entirety states:

> In this case, the intent is clear and Congress left no gap. The DHHS exceeded its statutory authority in instituting 42 CFR 51.42 given that PAIMIA confers no such right of access to facility residents, especially investigative interviews of minor children suffering from mental illness. The Congressional intent was not to confer such access as it was not provided in PAIMIA itself. In the Committee Report recommending passage of the PAIMIA, the Committee on Labor and Human Resources expressly stated that "the Committee intends that the scope of this bill should not be broadened or narrowed through the regulatory process." (Exhibit B, p. 9.) Perhaps the Committee recognized the constitutional infirmity in allowing such intrusions on individuals by a P & A system without consent.

(Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 19, ECF No. 18.)

Even if the Court were to assume, for argument's sake, that the statute is silent or ambiguous with respect to the interviews of minor children suffering from mental illness, the DHHS's interpretation is based on a permissible construction of the statute; it is rational and consistent with the statute. DHHS did not broaden the P & A Acts through the regulatory process. The case law without variance relies upon this regulation to require facilities to permit P & A systems unaccompanied access to individuals who are protected by PAIMI and the other statutes that combine to make the P & A Acts, finding ample support in the statutes to support

28

their reliance. *See, e.g., Georgia Advoc. Off., Inc. v. Camp*, 172 F.3d 1294, 1298 (11th Cir. 1999) ("in certain circumstances a system 'shall have reasonable unaccompanied access to residents at all times necessary to conduct a full investigation of an incident of abuse or neglect.' 42 C.F.R. § 51.42(b).").

This type of access fulfills the fundamental purpose of the P & A Acts, which "aim[] to protect the legal and human rights of individuals with developmental disabilities." *Connecticut Office of P & A*, 464 F.3d at 242. "To 'carry out the purpose' of the laws, the statutes and regulations expressly provide each P & A with access authority to 1) individuals, 2) records, and 3) public and private facilities." *Alabama Disabilities Advoc.*, 65 F. Supp. 3d at 1318 (citing 42 U.S.C. §§ 15043(a)(2)(H); 10805(a)(3) (authorizing "access to facilities in the State providing care or treatment"); *see also Tarwater*, 97 F.3d at 497 ("It is clear that the Act provides express authority for P & As to gain broad access to records, facilities, and residents to ensure that the Act's mandates can be effectively pursued.")).

In evaluating PAIR and PADD, then Judge Sotomayor for the Second Circuit explained the breadth of the P & A's investigative authority, including unaccompanied access to individuals, stating:

> [The statutes'] authority shall include the opportunity: to interview any facility service recipient, employee, or other person, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation; and to inspect, view and photograph all areas of the facility's premises that might be believed by the system to have been connected with the incident under investigation. 45 C.F.R. § 1386.22(f); *see also id.* § 1386.22(g) (noting that the system "shall have **unaccompanied** access to all residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours" for the purposes of fully investigating alleged abuse and neglect). *See Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F.3d 492, 497 (11th Cir. 1996) ("It is clear that [the DD] Act provides express authority for P & As to gain broad access to records, facilities, and residents to ensure that the Act's mandates can be effectively pursued."); *Pennsylvania Prot. & Advocacy, Inc. v.*

*Royer–Greaves Sch. for the Blind*, 1999 WL 179797, at *6 (E.D. Pa. Mar.25, 1999) (holding that "reasonable access includes general facility access without notice, and patient access with twenty-four hour notice"); *Mississippi Prot. & Advocacy System, Inc. v. Cotten,* 1989 WL 224953, at *8–9 (S.D. Miss. Aug.4, 1989) (noting that P & A systems must have "frequent personal contact" with individuals receiving services, and that "[c]entral to the concept of authority to investigate is the ability to interview witnesses"), *aff'd*, 929 F.2d 1054, 1059 (5th Cir.1991) (noting court's "full accord" with district court's conclusions regarding necessity of P & A access to individuals).

*Connecticut Office of P & A*, 464 F.3d at 241–42.

### 2.  Reasonable Access

DRO contends that it is entitled to unaccompanied access to the youth in an expedited manner. DRO argues that its request is reasonable in light of the fact that Buckeye Ranch "is required by state law to make children available for interview by Public Children Services Agencies upon as little as one hour's notice." (DRO's Second. Supp. to Mot. for Prelim. Inj. at 2, ECF No. 15.) Buckeye Ranch, however, asserts that DRO's requests are unreasonable because it prevents Buckeye Ranch from reviewing the request. Buckeye Ranch maintains that it should be "allowed some period of time to determine whether the selected child is mentally capable of participating in an interview without additional trauma." (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 21, ECF No. 18.)

Without this review by Buckeye Ranch, it contends the access to the youth may run afoul of the "codified bill of rights under PAIMI, which includes a resident's right to be free from intrusion by a visitor 'if a mental health professional treating such person determines that denial of access to a particular visitor is necessary for treatment purposes.'" *Id.* at 20 (citing 42 U.S.C. §10841(1)(J)). Buckeye Ranch continues, arguing:

In *Equip for Equal., Inc. v. Ingalls Mem. Hosp.*, 292 F. Supp. 2d 1086 (N.D. Ill. 2003) the court analyzed PAIMIA in the context of the P & A system's right to access facilities and patients of a psychiatric hospital for purposes of monitoring and education. The court recognized that "it is appropriate to require more strict requirements for access to individual patients than to facilities themselves." *Id.* at

1100. The court agreed that the requirement of reasonable access may include some consideration for accompanied access to specific residents based on medical judgment especially when those persons have serious emotional or behavioral disorders and who may be volatile or whose continued recovery could be jeopardized by visitors. The court declined to grant the P & A system's demand for unaccompanied access to the residents without advanced notice and at any reasonable time. The court recognized that there must be a balance between the concerns of the medical professionals who care for the patients with the right of access by the P & A system in order to minimize interference with a patient's treatment programs, to respect privacy interests and to provide security for all persons involved. *Id.*

(Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 21, ECF No. 18.) Buckeye Ranch's arguments are not well taken.

The *Equip for Equality* court was analyzing a subsection of the regulation that is not applicable to interviews requested pursuant to a complaint and probable cause finding. Instead, the *Equip for Equality* court was looking at subsection (c) of 42 C.F.R. § 51.42(c), which applies to access for the purpose of training, monitoring, and inspecting the facilities. That regulations provides that "a P & A system shall have reasonable unaccompanied access to facilities including all areas which are used by residents, are accessible to residents, and to programs and their residents at reasonable times, which at a minimum shall include normal working hours and visiting hours. . . .[for the purposes of] [p]roviding information and training . . . [m]onitoring compliance . . . and [i]nspecting, viewing and photographing all areas of the facility which are used by residents or are accessible to residents." 42 C.F.R. § 5142(c)(1), (2), (3).

Nonetheless, even under this training, monitoring, and inspecting section of the regulation, the *Equip for Equality* court held that the P & A system was entitled to access to the hospital's mental health facilities *and* patients, for the purpose of performing its monitoring and educating functions, even in absence of a court order, investigation or complaint; and the

hospital's complete refusal to allow the P & A access to its inpatient units was a violation both of PAIMI and the Illinois Protection and Advocacy for Mentally Ill Persons Act.

Further, the portion of the bill of rights relied upon by Buckeye Ranch is not directed at investigations of potential or confirmed abuse and neglect, and instead speaks to circumscription of a patient's rights to have visits, telephone calls, and mail. That section states in its entirety:

> The right, in the case of a person admitted on a residential or inpatient care basis, to converse with others privately, to have convenient and reasonable access to the telephone and mails, and to see visitors during regularly scheduled hours, except that, if a mental health professional treating such person determines that denial of access to a particular visitor is necessary for treatment purposes, such mental health professional may, for a specific, limited, and reasonable period of time, deny such access if such mental health professional has ordered such denial in writing and such order has been incorporated in the treatment plan for such person. An order denying such access should include the reasons for such denial.

42 U.S.C. § 10841(1)(J).

Finally, the Court need not be detained long assessing Buckeye Ranch's suggestion that DRO's federal funding should cast doubt on the validity of a DRO investigation. All P & A systems receive funding. This fact in no way makes their work less than legitimate.

### 3. Consent

Buckeye Ranch indicates that "it believed that DRO needed consent from parents or guardians before it could interview children under the applicable law and regulations." (Buckeye Ranch's Opp. to DRO Second Supp. to Mot. for Prelim. Inj. at 5, ECF No. 18.) Buckeye Ranch continues, stating:

> DRO claimed it did not need any such consent. The Buckeye Ranch meanwhile contacted the county agencies serving as legal guardians for the children requested for interview. In some cases, the county agency declined to consent or instructed that a caseworker be present for the interview. The Buckeye Ranch is understandably in a difficult position when its client, the legal guardian, refuses to authorize consent for an interview of the child in its care.

> The Buckeye Ranch determined that in order to adequately protect the children and itself given various competing rights of privacy it would request that this Court

interpret the applicable federal statutes and regulations before permitting DRO to interview minors without the consent of parents or guardians.

*Id.* at 5–6.

DRO responds that Buckeye Ranch "conflates the parental or guardian consent provision for access to records with the access requirements for conducting interviews of residents." (DRO's Second. Supp. to Mot. for Prelim. Inj., ECF No. 15 at 4, ECF No. 15.) This Court agrees.

"Nothing in the statutory language of either the [PA]DD Act or PAIMI conditions this [reasonable access to individuals in facilities] on the consent of an individual's parents or guardians." *Connecticut Office of P & A*, 464 F.3d at 243. Indeed, "[c]ontrary to the access provisions [this Court discussed at length *supra*,] PAIMI and the [PA]DD Act are very explicit about what type of authorization is required for a P & A system to view an individual's records: they detail from whom a P & A system must have authority to access records and when prior consent is necessary." *Id.* (citing 42 U.S.C. §§ 15043(a)(2)(I), 10805(a)(4)). The impact of this distinction is explained by the Second Circuit in its assessment of unaccompanied access in the absence of an investigation of abuse and neglect:

> That Congress provided explicit and detailed authorization provisions with respect to an individual's records but did not do so with respect to a P & A system's right to access a facility suggests that it did not intend to require a P & A system to obtain authorization prior to visiting a facility to observe conditions or interact with the individuals receiving services in that facility. *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and citation omitted; alteration in original)); *see also Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) (explaining that where Congress uses different words, it is presumed that Congress intended the different words to make a legal difference). We therefore decline defendants' invitation to read a parental-consent provision into the statute where none exists.

*Conn. Office of P & A*, 464 F.3d at 243 (parallel citations omitted). This Court finds this analysis equally applicable to unaccompanied access *during* investigations of abuse and neglect, where this access is almost always needed on a more expedited basis than when visiting a facility to observe conditions or interact with the residents.

Accordingly, the Court concludes that, when a P & A system opens an investigation based upon a report and a probable cause finding, the P & A is not required to obtain the consent of parents, guardians, or state agencies of whom the residents to have unaccompanied access to the youth who may have been abused, and to such others who may have information relevant to its investigation. 42 U.S.C. §10805(A)(1)(a); 42 C.F.R. §§51.42 (b) through (e); 45 C.F.R. §§1326.27(c)(1) and (d).

## V.

As to the remaining elements of the preliminary injunction analysis, there is no dispute that a P & A system's "inability to meet its federal statutory mandate to protect and advocate the rights of disabled people constitutes irreparable harm." *Ohio Leg. Rights*, 365 F. Supp. 2d at 883 (citing *Hartford,* 355 F.Supp.2d at 653 (citing cases)).

The Sixth Circuit has described the balance of equities prong as "whether issuance of a preliminary injunction would cause substantial harm to others." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citation omitted). This factor weighs in DRO's favor. Issuance of an injunction against Buckeye Ranch does not subject it to a penalty or hardship because it only requires compliance with the P & A Acts. Contrarily, Buckeye Ranch's refusal to allow DRO to access youth and records for investigatory purposes does, in a real and readily identifiable way, pose a threat to DRO's ability to discharge its statutorily mandated obligations. And, as to harm to any third parties, the Court finds none. DRO routinely conducts investigative visits of

facilities in Ohio without adverse effects. DRO has offered repeated assurances, which this Court finds no reason to doubt, that it will conduct its activities in a time and manner that is not disruptive to the youth.

Finally, the public interest is served by the fulfillment of DRO's mandate as the P & A agency, as evidenced by Congress's findings regarding the need for the P & A system. In determining the public interests that are relevant to a motion for a preliminary injunction, this Court may consider Congress's statements about the public interest. *See* 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.4 (2d ed.1995) ("The public interest may be declared in the form of a statute."); *see also*, *NACCO Materials Handling Group, Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x. 929, 944 (6th Cir. 2007). By enacting the P & A Acts, Congress made an explicit finding that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801. Congress created the P & A system, funded it, and granted it broad access authority because individuals with disabilities are "vulnerable to abuse, injury, and neglect." *Pennsylvania Prot. & Advocacy, Inc.*, 228 F.3d at 425. In these actions, Congress has expressed that the public interest is satisfied by allowing P & A systems, like DRO, access to the records and individuals it seeks from Buckeye Ranch.

## VI.

DRO requests, and Buckeye Ranch does not oppose, waiver of the bond that is a required requisite to the issuance of a preliminary injunction. Rule 65 of the Federal Rules of Civil Procedure provides that no "preliminary injunction shall issue except upon the giving of security by the applicant[.]" Fed. Civ. P. 65( c). "While [the Sixth Circuit] recognize[s] that the language of Rule 65(c) appears to be mandatory, and that many circuits have so interpreted it, the

rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). No bond is required of a governmental agency. DRO stands in the stead of a governmental agency. Further, this preliminary injunction imposes no significant financial burden on Buckeye Ranch. The equitable circumstances of the present case support a conclusion that the posting of a bond is not warranted. *See Am. Sys. Consulting, Inc. v. Devier*, 514 F. Supp. 2d 1001, 1010 (S.D. Ohio 2007) (finding that a bond was not warranted after an equitable analysis).

## VII.

Based on the foregoing, the Court **GRANTS** DRO's Motion for Preliminary Injunction (Case No. 18-cv-894, ECF No. 7, 9) and **DENIES** Buckeye Ranch's Motion for Temporary Restraining Order (Case No. 18-cv-906, ECF No. 2).

**IT IS SO ORDERED.**

<table>
<tr><td> 3-26-2019<br>**DATE**</td><td>**EDMUND A. SARGUS, JR.**<br>**CHIEF UNITED STATES DISTRICT JUDGE**</td></tr>
</table>